1
2
3                      UNITED STATES DISTRICT COURT
4                           DISTRICT OF NEVADA
5                                  * * *
6    MELVIN PERRY SPROWSON, JR.,              Case No. 3:20-cv-00170-MMD-CLB
7                        Petitioner,          ORDER
8          v.
9    NETHANJAH BREITENBACH,[1] *et al.*,
10                       Respondents.

11   **I.     SUMMARY**

12          Petitioner and Nevada state prisoner, Melvin Perry Sprowson, Jr., filed a

13   counseled Second-Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. §

14   2254. (ECF No. 21 ("Petition").) Before the Court is this matter for adjudication on the

15   merits of the remaining grounds in the Petition. The Court denies the Petition and grants

16   a Certificate of Appealability ("COA") for Grounds 1, 2, 4, 5(B), 6, and 7.

17   ///
18   ///
19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26
27          [1]The state corrections department's inmate locator page states that Sprowson is
     incarcerated at Lovelock Correctional Center, where Nethanjah Breitenbach is warden.
28   *See* NDOC Inmate Search; *see also* Lovelock Correctional Center Facility | Nevada
     Department of Corrections. The Court directs the Clerk of Court to substitute Nethanjah
     Breitenbach for Respondent Rene Baker under Fed. R. Civ. P. 25(d).

1

**II.     BACKGROUND[2]**

2

    **A.     The Prosecution's Case**

3

    In August 2013, 16-year-old J.T.[3] responded to 44-year-old Sprowson's

4

advertisement on Craigslist titled "lonely millionaire, 34." (ECF No. 36-3 at 100-03.) On

5

August 28, 2013, she ran away from home and lived with him until police found her on

6

November 1, 2013. (ECF No. 37-1 at 41, 50, 55-57, 189-90, 208.)

7

    When J.T. first contacted Sprowson on Craigslist, she disclosed to him that she

8

was 16 years old; when he asked if she was "jailbait," she informed him that 16 is the age

9

of consent in Nevada, and they exchanged photographs. (ECF Nos. 36-3 at 104-06; 37-

10

1 at 194-95.) Sprowson asked J.T. whether she was a virgin and whether she liked sex

11

and "right away" asked her to be his girlfriend. (ECF No. 36-3 at 105, 111.)

12

    Sprowson requested "sexy pictures" of J.T., and she sent him what she considered

13

to be sexy pictures, but he did not think they were sexy. (*Id.* at 111-15.) On multiple days,

14

he "gave" her "different positions and stuff to do for the pictures," and she responded with

15

photographs[4] of her naked breasts and "butt pictures" because "he wanted butt pictures,"

16

17

    [2]The Court summarizes the relevant state court record solely as background for consideration of the issues here. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

18

19

20

    [3]J.T. was 16 years old at the time of the offenses. (ECF No. 36-3 at 99, 104-05.) The Local Rules state: "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IC 6-1. The rule directs that only the initials of minors should be used. LR IC 6-1(2).

21

22

23

24

    [4]The photographs were admitted into evidence as State's Exhibits 24-28. (ECF No. 36-3 at 113-14; *see also* ECF No. 84.) In closing argument, the State explained the photographs supporting each child pornography count. (ECF No. 41-3 at 50-56.) State's Exhibit 25 (depicting J.T. bent over a chair in her underwear exposing her buttocks) and State's Exhibit 28 (depicting J.T. in her underwear with her legs spread) correspond to Count 3. (*Id.*). State's Exhibit 26 (depicting J.T.'s bare breasts) corresponds to Count 4. (*Id.*) State's Exhibit 24 (depicting J.T. in her underwear with her legs spread open) *(fn. cont...)*

25

26

27

28

1   and "he wanted crotch photos" and asked her "to spread" her "legs and stuff like that,"
2   while wearing a bra and panties. (ECF No. 36-3 at 112-20; ECF No. 37-1 at 2-3.)[5]
3   Sprowson transferred $150 to J.T.'s bank account, and they communicated daily using
4   an application that avoided her mother's detection. (ECF No. 36-3 at 109-10; ECF No.
5   37-1 at 10-11, 188-89.)

6       Before J.T. met Sprowson, she ran away from home twice, attended individual
7   counseling for two years, and attended counseling with her mother, Kathryn Smith. (ECF
8   No. 37-1 at 124-25; ECF No. 38-1 at 35.) According to Smith, J.T. "thought she shouldn't
9   have rules," and Smith had to "give her rules." (ECF No. 38-1 at 34.) Smith noticed that,
10  in August of 2013, J.T. spent a lot of time alone, texted a lot, and her computer screen
11  changed quickly when Smith checked on her. (*Id.* at 33.)

12      Before school started at the end of August 2013, J.T.'s mother gave her permission
13  to stay the night at her girlfriend's house, but J.T. lied to her mother and her friend and,
14  instead, stayed two nights at Sprowson's house. (ECF No. 37-1 at 11-15.) J.T. admitted
15  it could have been her idea to sleep at his house. (*Id.* at 178-79.) While she was there,
16  she learned that he was not 34 years old, but, rather, was 44 years old, and, although
17  they had sex the first night, she did not know whether they had sex on the second night.
18  (*Id.* at 8-9, 14-15.) She was "pretty sure" they drank alcohol on the second night. (*Id.* at
19  15-16.)

20      Sprowson gave J.T. a diamond promise ring signifying they would be married when
21  she turned 18 years old. (*Id.* at 16-17, 36.) J.T. hung the ring on her necklace to hide it
22  from her mother. (*Id.* at 19-20.) Smith, however, noticed the ring; J.T. lied about where
23  she obtained it, and Smith did not believe J.T.'s lies and confiscated the ring, J.T.'s

24  ──────────────
25  corresponds to Count 5. (*Id.*) State's Exhibit 27 (depicting J.T.'s bare buttocks)
    corresponds to Count 6. (*Id.*)

26      [5]J.T. testified the first and second photographs in State's Exhibit 28 were taken
27  "like my own way," with her shirt on; the third photograph of her "butt" was taken because
    he requested "butt pictures"; and the fourth photograph was taken because he wanted a
28  "crotch photo." (ECF No. 36-3 at 116-18.) J.T. claimed she would not have removed her
    shirt on her own volition and believed she took it off because they talked about it. (*Id.*)

1   telephone, and J.T.'s laptop computer. (*Id.* at 21, 23.) Smith noticed an unfamiliar

2   California telephone number on J.T.'s phone, asked questions, and J.T. lied about that

3   too. (ECF No. 37-1 at 21; ECF No. 38-1 at 41-42.) Smith called the California number four

4   or five times but reached a generic outgoing voicemail message. (ECF No. 38-1 at 40-

5   44, 50.)

6          On August 28, 2013, J.T. asked to use her laptop computer to "work[] on a school

7   assignment," but, instead, contacted Sprowson. (ECF No. 37-1 at 23.) J.T. told Sprowson

8   her mother was catching on, and, unless they figured something out, they would be

9   unable to communicate with each other for a long time. (*Id.* at 21-24.) She asked him to

10  pick her up, and, although he was reluctant and nervous that he would get into trouble

11  and suggested they wait until she was 18 years old, he nonetheless agreed to pick her

12  up. (*Id.* at 98-99, 107.) Before retiring that night, Smith again called the California

13  telephone number without success. (ECF No. 38-1 at 45-47.)

14         That night, at Sprowson's direction, J.T. obtained her social security card and birth

15  certificate. (ECF No. 37-1 at 24-25.) She snuck into her mother's bedroom while her

16  mother slept and retrieved her laptop computer and cellphone. (*Id.*) Sprowson picked up

17  J.T. down the street from her house. (*Id.* at 25-26.) She entered his car without being

18  forced, threatened, restrained, or harmed. (*Id.* at 189-90.) She told him he "didn't have to

19  take" her and she would understand, but he replied, "We're leaving." (*Id.* at 26.) He told

20  her to turn off her cellphone so her family could not track it. (*Id.* at 26-27.) That night he

21  disconnected his California phone number because her mother saw his number and he

22  didn't want her family to trace it. (*Id.* at 27, 148-49.)

23         The next morning, Smith discovered J.T. was gone along with her laptop computer,

24  telephone, social security card, birth certificate, and belongings. (ECF No. 38-1 at 48-49,

25  53-54.) Smith called the California telephone number around 5:30 a.m., but it was

26  disconnected. (*Id.* at 50.) Smith discovered Sprowson's $150 deposit to J.T.'s bank

27  account. (*Id.* at 33, 61-63.) Smith called friends and placed J.T.'s photograph on social

28  media and printed posters asking for help finding her. (*Id.* at 55, 66.) The Henderson

4

1   Police Department ("HPD") was slow to help, and Smith used the proceeds from selling

2   the ring she confiscated from J.T. to hire an investigator. (*Id.* at 55-58.)

3       While her mother searched for her, J.T. learned Sprowson was a Clark County

4   kindergarten teacher. (ECF No. 37-1 at 28.) While he was at work, she stayed in his

5   townhouse rather than attending school. (*Id.* at 28-29.) She remained truant so her family

6   and police would not find her. (*Id.* at 32.) If caught, they planned to claim she was his

7   roommate and was attempting to live on her own so she could emancipate. (*Id.* at 33,

8   111.) She agreed to "take the fall for everything" so they could avoid getting into trouble.

9   (*Id.* at 32-33, 102.) The plan was that she would return to him if taken away. (*Id.*)

10      Sprowson did not allow J.T. to turn on her cellphone, go outside, contact friends,

11  or visit anyone at his house for fear she might be recognized and found. (*Id.* at 31-33, 36-

12  37, 200-01.) She told him it was difficult being inside the house all day, so he once drove

13  her past her family home and once took her to a lake. (*Id.* at 37-38.) He had her dress in

14  boyish loose clothes with her hair under a hat. (*Id.*) J.T. was not physically forced to stay

15  at his house; however, she felt she could not leave as she felt guilty, and it would hurt his

16  feelings because he told her he sacrificed everything for her and could get in trouble. (*Id.*

17  at 38-41, 147.) He never said she could not go home but told her he did not want her to

18  leave. (*Id.* at 152-53.)

19      During the two months J.T. lived with Sprowson, his emotions changed quickly,

20  and he was sometimes critical. (*Id.* at 52-53, 157.) He had frequent angry episodes when

21  he would insist she pack her belongings to return home; but, after packing her belongings,

22  she would not leave because he would become sad, cry, and tell her how much he

23  sacrificed for her. (*Id.* at 39-41, 205.) J.T. felt depressed while living with Sprowson

24  "because there was nobody else around." (*Id.* at 200.) Although Sprowson told J.T. that

25  Smith was not looking for her and did not care, one day he showed her a missing-person

26  poster bearing her name and photograph. (*Id.* at 50-52.)

27      Based on J.T.'s telephone records, which showed Sprowson's disconnected

28  phone number made numerous lengthy calls to and from J.T. until the day she went

5

missing and J.T.'s bank records showing Sprowson's $150 deposit, a private investigator visited Sprowson's townhome; however, Sprowson denied hearing from J.T. in months and claimed he didn't know she was missing. (ECF No. 38-1 at 120-21; ECF No. 39-1 at 44-47.) Before opening the door to the investigator, Sprowson told J.T. to hide her belongings from view of the front door. (ECF No. 37-1 at 41-42.) After the investigator departed, Sprowson told J.T. he did not think the investigator suspected she was there. (*Id.* at 43.)

The private investigator provided information to HDP, and HPD Officer Thomas Logiudice met Sprowson. (ECF No. 38-1 at 122-24, 135-36.) Sprowson admitted previously communicating with J.T., claimed her age never came up during their communications, said he loaned her $150 because she had difficulties at home, claimed he never met her in-person and did not know her whereabouts, and stated that he disconnected his California phone number because he just moved to Las Vegas and wanted a local phone number. (*Id.* at 122-24, 135-42.) Sprowson told J.T. that the police visited him, that they thought she was a prostitute, and that they did not realize she lived with him. (ECF No. 37-1 at 54-55.)

Gary Abbott, an officer with the Clark County School District, learned Sprowson was a teacher for the school district and learned from HPD that Sprowson was J.T.'s last known phone contact before she went missing. (ECF No. 38-1 at 150-54.) On October 31, 2013, Abbott and HPD detective Platt met Sprowson. (*Id.* at 155.) Sprowson told them he never met J.T., her age never came up, he loaned her $150, and he did not know her whereabouts. (*Id.* at 156-57.)

The next day, Abbott went to Sprowson's townhome, told the manager he was looking for a missing minor, and asked whether anyone was on the lease or living with Sprowson. (*Id.* at 158-59.) The manager sent a maintenance worker to Sprowson's apartment to check on a smoke detector. (*Id.* at 159, 171-72.) The maintenance worker reported a young lady in Sprowson's townhome claimed to be Sprowson's 18-year-old niece. (*Id.* at 160, 175.) Abbott discovered J.T. in Sprowson's townhouse and, realizing

1    she was caught, she cried and screamed, "you can't come in, you don't have a warrant,

2    you don't have any business in here, leave me alone, I want to be here." (*Id.* at 160-61.)

3         That night, J.T. returned to her family but wanted to return to Sprowson's house

4    because she felt guilty for not sticking to their plan. (ECF No. 37-1 at 58-59.) J.T. "didn't

5    want anything to do with" Smith, did not want Smith to touch her and said she hated her,

6    did not want to be there, and tried to leave. (ECF No. 37-1 at 59; ECF No. 38-1 at 69-70.)

7    J.T. told Smith she was going back to Sprowson, and there was no way he was going to

8    jail. (ECF No. 38-1 at 70.) The next day, Smith took J.T. to Monte Vista treatment center

9    where J.T. was treated until November 11, 2013. (ECF No. 39-1 at 64.)

10        Upon returning home, J.T. threatened to kill herself if she could not be with

11   Sprowson and attempted to jump over the upstairs balcony to leave. (ECF No. 37-1 at

12   61-62, 212-13.) J.T. returned to Monte Vista where she stayed November 16 through

13   December 11, 2013. (ECF No. 39-1 at 68.) Pediatric physician, Bryn Rodriguez,

14   examined J.T. at Monte Vista. (*Id.* at 64.) Rodriguez's impression on November 2, 2013,

15   was that J.T. "was definitely completely enraptured with the idea of being in love" and

16   "very fixated" on returning to Sprowson. (*Id.* at 65-67.) But, when J.T. was readmitted on

17   November 16, 2013, things had changed: "there was much less about [Sprowson], and it

18   was much more about just being generally upset with everything going on." (*Id.* at 68-69.)

19        After Monte Vista, J.T. went to Willow Springs treatment center until she returned

20   home in May of 2014. (ECF No. 38-1 at 76.) J.T. was at Willow Springs less than a week

21   when she testified at the Preliminary Hearing. (ECF No. 37-1 at 64.) She claimed she

22   testified truthfully on direct examination, but "after the break, [Sprowson] started like

23   making faces and like wording things" "like I love you" and winked. (*Id.* at 65-66.) This

24   made her feel guilty because she did not stick to their plan. (*Id.*) She tried to return to the

25   plan on cross-examination by protecting Sprowson as she felt "really, really bad." (*Id.* at

26   66-67.) She later wrote a letter to the Court explaining she withheld information at the

27   Preliminary Hearing because she wrongly felt she needed to protect Sprowson and

28

1    because Sprowson winked, whispered to her, and placed his hand on his heart. (*Id.* at

2    70-71.) It was her idea to write the letter because she had not told the truth. (*Id.*)

3         Social worker Vena Davis treated J.T. (ECF No. 40-1 at 40.) Davis testified that,

4    before the experience with Sprowson, J.T. had undergone therapy for heightened anxiety,

5    overwhelming emotions, and history and fear of abandonment. (*Id.* at 41.) Davis assessed

6    J.T. and noted J.T. had "amplified anxiety," "a lot of self-judgment that ended up creating

7    a lot of shame," leading to "more heightened anxiety" and "painful emotions." (*Id.* at 42-

8    43.) J.T. "was very anxious about going back to school and kind of concerned that people

9    may know about her trauma history." (*Id.* at 49.) J.T. expressed anxiety over Sprowson

10   blaming her. (*Id.* at 50.) J.T. practiced social interactions and learned behaviors to

11   regulate her emotions because she was overwhelmed by engagement in social

12   interactions due to her isolation with Sprowson for two months. (ECF No. 37-1 at 72-74.)

13   When she returned home from Willow Springs, she told Smith about sending naked

14   pictures of herself to Sprowson because she was embarrassed and worried others would

15   see them. (ECF No. 38-1 at 75.) Police discovered the photographs on Sprowson's

16   telephone and laptop computer. (*Id.* at 103, 107, 113.)

17        J.T. believed Sprowson was in jail and there was a no-contact order. (ECF No. 37-

18   1 at 71, 81.) However, on January 2, 2015, J.T. received a follow request on Instagram

19   from someone named Audrey whose birthday was the same as J.T., and J.T. realized the

20   message was from Sprowson because Audrey was the name they chose to name their

21   future daughter. (*Id.* at 74-75.) Smith heard J.T. scream, "he found me, he found me."

22   (ECF No. 38-1 at 78.) J.T. sent Sprowson a "goodbye, Mel" message and became

23   frustrated when Sprowson replied, "Are we breaking up?*"* (ECF No. 37-1 at 83.) The

24   Instagram messages disappeared and reappeared and changed screennames, but J.T.

25   gave screenshots of the messages to the police. (*Id.* at 75-77.) Police determined the

26   screennames were associated with Sprowson and sent from a hotel at which he was

27   registered at the time. (ECF No. 39-1 at 128-39; ECF No. 40-1 at 30-37.)

28

1          **B.    The Defense Case[6]**

2          Sprowson moved from California to Las Vegas for a teaching job. (ECF No. 40-1

3    at 57.) One night he was bored and posted an advertisement on Craigslist as a joke, i.e.,

4    "lonely millionaire seeks gold digging slut." (*Id.* at 59.) He received multiple responses,

5    including from J.T. (*Id.* at 59-60.) She told him she was 16 years old, he responded that

6    he did not want to talk with her unless it was okay with her parents, and she replied, "Well,

7    16 is the age of consent." (*Id.*)

8          J.T. told him which times to call her, and he made most of the calls because her

9    aunt paid her phone bill, and J.T. did not want to raise the bill too high. (*Id.* at 72-73, 132-

10   33.) He found out she had been grounded for two years, her computer and telephone had

11   been taken away, and her mother would not approve of their relationship. (*Id.* at 76.) He

12   claimed J.T. asked whether he wanted a "breast picture," and he said, "Okay." (*Id.* at 110.)

13   He claimed she asked, "What kinda poses do you like," he told her, and she sent him

14   pictures. (*Id.* at 111.) She sent him two "nude photos" at his request. (*Id.* at 111-12.) He

15   wired $150 into her bank account for school clothes and claimed he knew J.T.'s mother

16   had access to her bank account and would know his name was on the deposit. (*Id.* at 68-

17   69.)

18         J.T. said she wanted to spend the night with him, he asked whether it was alright

19   with her mother, and she assured him that she would not get into trouble for it. (*Id.* at 70-

20   71.) He was reluctant, but J.T. "kept insisting." (*Id.*) When J.T. wanted to spend a second

21   night at his house, he told her to call her mom, and J.T. told him her mother said it was

22   alright. (*Id.* at 72.) He dropped her off in front of her house the next day. (*Id.*) He bought

23   the ring for a prior girlfriend, but that relationship did not work out, and he gave it to J.T.

24   as a promise ring. (*Id.* at 73-74.)

25         When her computer and telephone were taken away again, they lost contact for a

26   day or so until J.T. emailed him while she was supposed to be doing schoolwork and told

27

28         [6]Sprowson represented himself and testified on his own behalf; the trial court
     appointed standby counsel. (ECF No. 34-2 at 2.)

9

1   him she was grounded, her mother took her computer and telephone, and she would kill

2   herself if he did not pick her up that night. (*Id.* at 76-79.) He was concerned about her

3   emotional issues and agreed to pick her up. (*Id.*) He told her to bring her social security

4   card and birth certificate in case of an emergency. (*Id.* at 80-81, 84.) J.T. asked him to

5   change his phone number, and he was going to do that anyway, so he did it to ease her

6   mind. (*Id.* at 79-80.)

7        Sprowson claimed he never tried to keep J.T. from her mother. (*Id.* at 118.) He

8   mentioned emancipation to J.T. as an option after she told him she had a job, wanted to

9   live on her own, and was tired of living with her mother. (*Id.* at 66-68.) Sprowson claimed

10  he wanted J.T. to return home, but she did not leave, and he did not push her to leave

11  because she had threatened to kill herself. (*Id.* at 83-84, 92, 117.) When the investigator

12  and police questioned him, he lied because a month had passed, and he was worried

13  about getting into trouble. (*Id.* at 89-94.)

14       After J.T. was found and he was arrested, he bailed out and believed his bail had

15  no conditions; he claimed he was later notified his bail conditions included no contact with

16  minors and no internet use. (*Id.* at 98-100.) He denied contacting J.T. while on bail and

17  suggested that a woman he met in a bar who stayed in his hotel room knew his story and

18  had access to his computer and passwords. (*Id.* at 101-04.)

19       **C.    State Court Proceedings**

20       A jury convicted Sprowson of (1) first-degree kidnapping ("kidnapping"), (2) child

21  abuse, neglect, or endangerment with substantial bodily or mental harm ("child abuse"),

22  and (3) four counts of unlawful use of a minor in the production of pornography ("child

23  pornography"). (ECF No. 41-6.) Sprowson appealed, and the Nevada Supreme Court

24  reversed and remanded for a new trial on the child abuse conviction. (ECF No. 43-11 at

25  5-6.) The judgment was amended striking the child abuse conviction. (ECF No. 44-9 at

26  4.) Sprowson unsuccessfully pursued state post-conviction relief. (ECF No. 16-12.)

27  ///

28  ///

10

### III.    LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to established Supreme Court precedent within the meaning of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of established Supreme Court precedent under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101

1    (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court

2    has stated, "[e]ven a strong case for relief does not mean the state court's contrary

3    conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also*

4    *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to

5    meet" and "highly deferential standard for evaluating state court rulings, which demands

6    that state court decisions be given the benefit of the doubt") (internal quotations and

7    citations omitted). To obtain habeas relief, a prisoner must show that the state court's

8    ruling on the claim presented was "so lacking in justification that there was an error well

9    understood and comprehended in existing law beyond any possibility for fairminded

10   disagreement." *Harrington*, 562 U.S. at 103.

11   **IV.    DISCUSSION**[7]

12       **A.    Ground 1**[8]

13         Sprowson alleges the trial court violated his constitutional rights to (1) presence at

14   all critical stages of the proceedings; and (2) an impartial jury in violation of the Fifth, Sixth,

15   and Fourteenth Amendments. (ECF No. 21 at 9-10.) He contends the trial court violated

16   his rights by excusing prospective jurors based on unsworn statements given to the

17   court's marshal outside the presence of the parties. (*Id.*) Respondents contend the

18

19       [7]Sprowson asserts the standard of review proscribed by 28 U.S.C. § 2254(d)

20   violates the U.S. Constitution and, specifically, the Suspension Clause (Article One, Section Nine, Clause Two); fundamental principles of separation of powers (Articles One,

21   Two, and Three); the ban on cruel and unusual punishments (Amendments Eight and Fourteen); and the guarantee of due process (Amendments Five and Fourteen). (ECF

22   No. 21 at 9.) Respondents did not address these allegations in their answer to the Petition. (ECF No. 70.) Sprowson concedes the Ninth Circuit Court of Appeals rejected arguments

23   that AEDPA violates the Suspension Clause and separation of powers doctrine. (ECF No. 21 at 9) (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)). Rule 2(c) of the Rules

24   Governing Section 2254 Cases requires a federal habeas petition specify all grounds for relief and "the facts supporting each ground." Conclusory allegations unsupported by

25   specific facts may be summarily dismissed. *See Mayle v. Felix*, 545 U.S. 644, 649, 655-56 (2005); *see also Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Sprowson failed to

26   specify facts or law in the Petition to support these allegations. The Court therefore dismisses these allegations with prejudice as conclusory and without merit and denies a

27   COA.

28       [8]For clarity, the Court subdivides the claims in Grounds 1 and 2.

1    Nevada Supreme Court reasonably concluded Sprowson did not demonstrate prejudice
2    because Sprowson had the opportunity to object to excusals and instead agreed to
3    excuse all except one prospective juror who was ineligible for service. (ECF No. 70 at 10-
4    12.)

                        **1.    Additional Background**
5
6    Before jury selection, the trial court informed the parties that some of the
7    prospective jurors provided the trial court's marshal with reasons to excuse them from
8    jury service. (ECF No. 34-2 at 102-03.) The court discussed those excuses with the
9    parties and gave them an opportunity to excuse the prospective jurors based on those
10   statements or advance the prospective jurors to *voir dire*. (*Id.* at 102-114.)

11   Sprowson objected to excusal of three prospective jurors who advanced to *voir*
12   *dire*. Prospective Juror # 631 stated she and the trial judge knew each other from their
13   work for State Farm Insurance Company. (*Id.* at 103-05.) The trial judge did not know
14   #631 personally. (*Id.*) #631 remained on the panel because Sprowson stated he would
15   "probably have to ask her a few questions" before excusing her from jury service. (*Id.*)
16   Prospective Juror #768 claimed he was blind in one eye and could not drive and, at
17   Sprowson's request, remained on the panel. (*Id.* at 110-11.) Prospective Juror #717
18   claimed she was closing escrow on a house at 3 p.m. but lacked documentation, and the
19   parties agreed to her remaining on the panel for questioning. (*Id.* at 108-09.)

20   Sprowson agreed to excuse three prospective jurors who, according to the record,
21   presented documentation supporting their hardships. Prospective Juror # 635 claimed
22   she was caregiver for her mother and small children; the marshal stated she provided
23   documentation that her mother just had major surgery; and Sprowson agreed to excuse
24   her. (*Id.* at 105-07.) Prospective Juror # 725 provided documentation of prepaid and pre-
25   planned travel. (*Id.* at 109-10.) Sprowson initially stated he wished to keep #725 on the
26   panel; however, when the trial court explained that #725 would likely be dismissed
27   because of the documentation, Sprowson agreed to dismiss #725. (*Id.*) The trial court

28

                                            13

1   stated Prospective Juror # 728 provided documentation of prepaid, preplanned travel,

2   and the parties agreed to excuse him. (*Id.*)

3          Sprowson agreed to excuse six prospective jurors despite their lack of

4   documentation. Prospective Juror # 644 claimed she was hard of hearing, and, although

5   the marshal informed her they had "the ear thing," the parties consented to excuse her.

6   (*Id.* at 107-08.) The parties agreed to excuse Prospective Juror # 682 as his child was

7   recently run over by a school bus. (*Id.* at 108.) Prospective Juror # 771 stated he had a

8   special-needs daughter, and the parties agreed to excuse him. (*Id.* at 111.) The parties

9   agreed to excuse Prospective Juror # 833 who claimed she had university classes during

10  the day Monday through Thursday. (*Id.* at 113.) Sprowson initially objected to releasing

11  Prospective Juror #809, who indicated she was breast-feeding a 10-month-old baby and

12  was the sole food provider, but, after the marshal stated she told him she never removed

13  her pumps, Sprowson agreed to excuse her. (*Id.* at 111-13.)

14         The trial court stated Prospective Juror # 788 was not a United States citizen and

15  therefore could not sit on the jury. (*Id.*) Sprowson responded, "That one's not qualified?"

16  and the trial court excused #788 explaining, "No, you have to be a U.S. citizen." (*Id.*)

17                      **2.      Rights to Presence and Impartial Jury**

18         While "[t]he constitutional right to presence is rooted to a large extent in the

19  Confrontation Clause of the Sixth Amendment," the Supreme Court has "recognized that

20  this right is protected by the Due Process Clause in some situations where the defendant

21  is not actually confronting witnesses or evidence against him." *See United States v.*

22  *Gagnon*, 470 U.S. 522, 526 (1985) (citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970)). The

23  Supreme Court has explained that "[t]he presence of a defendant is a condition of due

24  process to the extent that a fair and just hearing would be thwarted by his absence, and

25  to that extent only." *Id.* (internal quotation marks omitted) (quoting in part *Snyder v.*

26  *Massachusetts*, 291 U.S. 97, 105-06 (1934), and *Faretta v. California*, 422 U.S. 806, 819

27  & n.15 (1975) (acknowledging "an accused has a right to be present at all stages of the

28  trial where his absence might frustrate the fairness of the proceedings")). "[T]he exclusion

14

1   of a defendant from a trial proceeding should be considered in light of the whole record."

2   *Id.* (citing *Snyder*, 291 U.S. at 115.) The right of presence includes voir dire and

3   empaneling of the jury. *See Diaz v. United States*, 223 U.S. 442, 455 (1912).

4          "The Supreme Court has never held that the exclusion of a defendant from a critical

5   stage of his criminal proceedings constitutes a structural error." *United States v. Reyes*,

6   764 F.3d 1184, 1197 & n.4 (9th Cir. 2014) (quoting *Campbell v. Rice*, 408 F.3d 1166,

7   1172 (9th Cir. 2005)). For example, the Supreme Court has determined the fact that a

8   defendant was denied the right to be present during an *ex parte* communication between

9   the judge and juror was a trial error that was subject to harmless error analysis. *See id.*

10  (citing *Rushen v. Spain*, 464 U.S. 114, 117 (1983)); *see also*, *e.g.*, *Gagnon*, 470 U.S. at

11  526 (declining to find a due process violation in defendant's exclusion from a brief in-

12  chambers *voir dire*).

13         The Constitution requires a criminal defendant be afforded an impartial jury, and

14  "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire*

15  to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). The Supreme

16  Court has found the existence of a biased trial judge is structural error. *See Tumey v.

17  Ohio*, 273 U.S. 510 (1927). The Ninth Circuit Court of Appeals has determined "[t]he

18  presence of a biased juror is a structural error, not subject to the harmless error analysis,

19  and if one is found the defendant is entitled to a new trial." *Estrada v. Scribner*, 512 F.3d

20  1227 (9th Cir. 2008) (citing *Dyer v. Calderon*, 151 F.3d 970, 973 & n.2 (9th Cir. 1998)).

21         In Nevada, a trial court shall administer an oath or affirmation to prospective jurors

22  and may conduct an initial examination as to their qualifications to serve as jurors:

23         5. Before persons whose names have been drawn are examined as
       to their qualifications to serve as jurors, the judge or the judge's clerk shall
24     administer an oath or affirmation to them in substantially the following form:

25         Do you, and each of you, (solemnly swear, or affirm
       under the pains and penalties of perjury) that you will well and
26     truly answer all questions put to you touching upon your
       qualifications to serve as jurors in the case now pending
27     before this court (so help you God)?

28

6. The judge shall conduct the initial examination of prospective jurors and the parties or their attorneys are entitled to conduct supplemental examinations which must not be unreasonably restricted.

NRS § 16.030(5), (6).

A trial court's failure to administer the oath of truthfulness prescribed by NRS § 16.030(5) before commencing *voir dire* constitutes a structural denial of due process, and a conviction resulting from an improperly selected jury must be reversed. *See Barral v. State*, 353 P.3d 1197, 1200 (2015).

### 3.    State Court's Determination

The Nevada Supreme Court ("NSC") determined:

*Structural error during voir dire*

[S]prowson contends that the district court committed structural error during voir dire and that given his pro se status he adequately preserved this issue for appeal. We conclude that Sprowson did not preserve the issue because his queries lacked the specificity required, even under a liberal construction. *See United States v. Gray*, 581 F.3d 749, 752-53 (8th Cir. 2009) (recognizing that although a pro se defendant's objections should be given a liberal construction, the defendant's complaint must be sufficiently specific to convey the objection); *Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995) (concluding that a pro se litigant's objections preserved error where they "sufficiently directed the district court to the alleged errors"); *Jeremias v. State*, 134 Nev., Adv. Op. 8, 412 P.3d 43, 48 (2018) (concluding that generally a defendant must object, even to alleged structural error, so that the district court has an opportunity to correct it). Thus, we review for plain error.

To obtain relief under plain-error review, "an appellant must demonstrate that: (1) there was an 'error'; (2) the error is 'plain,' meaning that it is clear under current law from a casual inspection of the record; and (3) the error affected the defendant's substantial rights." *Jeremias*, 134 Nev., Adv. Op. 8, 412 P.3d at 48 (quoting *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)). "[A] plain error affects a defendant's substantial rights when it causes actual prejudice or a miscarriage of justice (defined as a 'grossly unfair' outcome)." *Id.* at 49 (citing *Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008)).

The district court erred to the extent it delegated its duty to gather sworn information from potential jury members to its marshal. *See* NRS 16.030(5) (stating that "[b]efore persons whose names have been drawn are examined as to their qualifications to serve as jurors, *the judge or the judge's clerk* shall administer an oath or affirmation to them" (emphasis added)); NRS 16.030(6) ("*The judge* shall conduct the initial examination of prospective jurors and the parties or their attorneys are entitled to conduct

supplemental examinations which must not be unreasonably restricted."
(emphasis added)). Nonetheless, the error does not qualify as plain
because it did not prejudice Sprowson or affect his substantial rights. The
record demonstrates that Sprowson agreed to the release of all but one of
the excused jurors and the one juror he did not consent to release was a
noncitizen who was ineligible for jury duty. *See Jeremias*, 134 Nev., Adv.
Op. 8, 412 P.3d at 49-50 (concluding no prejudice resulted from the district
court's voir dire errors that occurred in only one small part of the jury-
selection process); *Collins v. State*, 133 Nev. 717, 724, 405 P.3d 657, 664
(2017) (recognizing a distinction between "administrative and preliminary
voir dire" and "substantive voir dire"). Accordingly, we discern no plain error
on this record entitling Sprowson to relief.

(ECF No. 43-11 at 2-4.)

### 4.    Analysis of Ground 1(A)—Presence

During his state court appeal, Sprowson presented this claim in a footnote:

Sprowson also had "the right under the Confrontation Clause of the
Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth
Amendments to be present at every stage of the trial." *Collins v. State*, 405
P.3d 657, 661 (Nev. 2017) (citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970);
*United States v. Gagnon*, 470 U.S. 522, 526[] (1985); Nev. Const. art. I, §
8). The court violated these rights by allowing her Marshall to question the
prospective jurors outside the parties' presence.

(ECF No. 43-1 at 30 & n.12.)

Neither the State nor Sprowson addressed the claim in their answer or reply briefs

to the NSC, and the NSC did not expressly acknowledge the claim in its order. (ECF No.

43-5 at 17-24; ECF No. 43-7 at 9-17; ECF No. 43-11 at 2-4.)

To exhaust a claim for federal habeas review, a petitioner must fairly present to

the state courts that he is making a claim under the U.S. Constitution and describe "both

the operative facts and the federal legal theory on which his claim is based so that the

state courts [could] have a 'fair opportunity' to apply controlling legal principles to the facts

bearing upon his constitutional claim." *See Castillo v. McFadden*, 399 F.3d 993, 999 (9th

Cir. 2005) (quoting *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003) (overruled on other

grounds by *Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007)); *see also Gray v.

Netherland*, 518 U.S. 152, 162-63 (1996) (stating that, "[F]or purposes of exhausting state

remedies, a claim for relief in habeas corpus must include reference to a specific federal

constitutional guarantee, as well as a statement of the facts that entitle the petitioner to

1   relief."). In AEDPA cases, there exists a rebuttable presumption that the state court
2   adjudicated the claim on the merits where the claim was fairly presented, and the state
3   court addressed a related claim but did not expressly acknowledge the claim. *See*
4   *Johnson v. Williams*, 568 U.S. 289, 298 (2013); *see also Harrington*, 562 U.S. 99. Where
5   a state court's decision is unaccompanied by explanation, a habeas petitioner must show
6   there was no reasonable basis for the state court to deny relief. *See Harrington*, 562 U.S.
7   at 98. "This is not de novo review"; rather, a reviewing court must determine "what
8   arguments or theories supported or . . . could have supported, the state court's decision;
9   and then it must ask whether it is possible fairminded jurists could disagree that those
10  arguments or theories are inconsistent with the holding in a prior decision of [the
11  Supreme] Court." *Id.* at 102. "A state court's determination that a claim lacks merit
12  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the
13  correctness of the state court's decision." *Id.* at 101. Sprowson has not rebutted the
14  presumption; therefore, the NSC adjudicated the merits of Ground 1(A).

15         Sprowson did not object to his lack of presence during the marshal's conversations
16  with the prospective jurors. Although the marshal questioned prospective jurors without
17  placing them under oath and did so outside Sprowson's presence, the marshal reported
18  the prospective jurors' statements to the trial court, and the trial court, in turn, relayed
19  them to the parties. Sprowson fully participated in the discussion about the
20  representations of each prospective juror. He successfully objected to excusal of three
21  prospective jurors who advanced to *voir dire* where they would be subject to further
22  questioning. Thus, Sprowson was aware that he could request further questioning of the
23  prospective jurors concerning their representations excusing them from service. He
24  agreed with the dismissal of all the other prospective jurors who were excused except the
25  lone juror whom the trial court stated was a non-citizen. Sprowson has not established
26  that, had he been present for the questioning of the prospective jurors with the marshal,
27  objection to excusal of the juror who claimed non-citizenship would have been granted.

28

1    Fairminded jurists would agree Sprowson has not demonstrated his absence from

2    the marshal's communication with the prospective jurors affected his substantial right to

3    be present at *voir dire*, affected the fairness of the proceedings, or thwarted the fairness

4    and justice of the jury selection. *See Gagnon*, 470 U.S. at 526. Ground 1(A) is denied

5    because the NSC's determination is neither contrary to nor constitutes an unreasonable

6    application of clearly established federal law as determined by the Supreme Court and is

7    not based on an unreasonable determination of fact.

8                    **5.    Analysis of Ground 1(B)—Impartial Jury**

9    Sprowson cites no clearly established Supreme Court authority holding the excusal

10   of prospective jurors without first administering an oath constitutes structural error in the

11   absence of a contemporaneous objection. Sprowson could have objected to the trial

12   court's failure to administer an oath of truthfulness but did not do so. Sprowson fails to

13   demonstrate any of the excused prospective jurors lied about their hardship excuses, that

14   #788 was in fact a U.S. citizen who could have served on the jury, or that any of the jurors

15   who served on his jury lacked impartiality. The NSC thus reasonably concluded that the

16   trial court's failure to administer an oath to the prospective jurors neither prejudiced

17   Sprowson nor affected his substantial rights, and that he was not denied his right to an

18   impartial jury. The Court denies Ground 1(B) because the NSC's determination is neither

19   contrary to nor constitutes an unreasonable application of clearly established federal law

20   as determined by the Supreme Court and is not based on an unreasonable determination

21   of fact.[9]

22             **B.    Ground 2**

23   Sprowson alleges the trial court violated his rights to confrontation and to present

24   a complete defense in violation of the Fifth, Sixth, and Fourteenth Amendments by

25   _____

26   [9]Sprowson claims the NSC unreasonably conducted plain error review of this claim
     by unreasonably determining he did not preserve this claim because he was insufficiently
27   specific to convey the objection to this claim. The record shows, however, that, although
     Sprowson objected to excusal of some of the prospective jurors, he never objected the
28   prospective jurors were not first placed under oath during their communications with the
     marshal. Thus, the NSC reasonably applied plain error review.

                                    19

excluding evidence based on Nevada's rape shield statutes. (ECF No. 21 at 11-13.) He contends exclusion of J.T.'s history of meeting older men online and running away with them to escape her mother would have bolstered his defense to the kidnapping charge by supporting his claim that he allowed J.T. to live with him but did not intend to keep J.T. from her mother. (*Id.*) He claims his inability to ask J.T. whether this was the first online posting she ever responded to, whether she ever ran away for similar reasons, and why she had prior mental health treatment undermined his defense. (*Id.*) He argues his inability to ask J.T. about her sexual history prevented him from defending against the child pornography charge by impeaching J.T.'s testimony that she had not previously taken the photograph of her breast. (*Id.*) In his reply brief, he claims the evidence was relevant to J.T.'s credibility for the kidnapping and child pornography charges. (ECF No. 94 at 28.) Respondents argue the evidence was not excluded under the rape shield statute and was instead excluded as irrelevant. (ECF No. 70 at 12-16.) They argue the evidence was irrelevant to kidnapping because it fails to prove or disprove any element of kidnaping and consent is not a defense to kidnapping of a person under 18 years of age. (*Id.*) They argue the evidence was irrelevant to the child pornography charges and Sprowson failed to pursue further cross-examination after J.T. denied taking the breast photograph before their relationship. (*Id.*)

### 1.    Additional Background

The State moved *in limine* to preclude evidence that J.T. was previously a victim in a sexual abuse case by a man she met online.[10] (ECF No. 28-4.) The State argued the evidence was irrelevant, lacked probative value, and any probative value was outweighed by the danger of unfair prejudice, misleading the jury, and was improper character evidence. (*Id.*) The State argued Nevada's rape shield statutes, NRS § 48.069 and § 50.090, prohibited impeachment for prior sexual conduct. (*Id.*) Sprowson opposed

---

[10]Two years before meeting Sprowson, J.T. met David Scholman online, and he ultimately pleaded guilty to luring a child with use of technology with the intent to engage in sexual assault and attempted sexual assault. (ECF No. 28-4 at 10-11.)

1    arguing, among other things, J.T.'s sexual abuse case was relevant to the child abuse

2    charge because it alleged he caused J.T. substantial mental harm. (ECF No. 28-14 at 6.)

3    At a hearing on the motion, the defense argued, among other things, the rape

4    shield statutes were inapplicable because there is no sexual assault allegation, and the

5    prior sexual abuse was relevant and admissible because it occurred two years before

6    J.T.'s involvement with Sprowson, and it was impossible to separate mental harm caused

7    by Sprowson versus harm caused by the prior sexual abuse. (ECF No. 28-15 at 10-13,

8    15.) The State argued the rape shield statutes apply even though there is no sexual

9    assault charge. (*Id.*) The State argued Sprowson could, without getting into the facts of

10   the prior sexual abuse case, cross-examine J.T. about whether she had preexisting

11   mental issues, was previously seen by a physician, had been suffering, etc. (*Id.* at 14-

12   15.) The trial court concluded J.T.'s prior psychological issues were relevant to the

13   defense's case but "why" J.T. had psychological issues was irrelevant:

> 14   THE COURT: Okay. I was going to grant the motion. I'll tell you what. I don't
> 15   think the why is important, however, I do think that the psychological issues
> she had before are relevant to the defense's case because I guess there's
> always a theory you could argue she's no worse off after the Sprowson
> 16   incident than she was before, she was [a] mess before, and I think that is
> entirely relevant since it's an element of one of the charges. But, again, at
> 17   this point I don't think that the why is important. But I obviously let the
> 18   defense get into the fact that she was suffering some emotional . . . distress.
>
> 19   . . . .
>
> 20   THE COURT: [I] think the mental state is relevant because it's
> something that's charged in this case, but I don't want to get into the prior
> 21   event.

22   (*Id.* at 16-17.) The trial court, however, deferred its final decision until it reviewed *in*

23   *camera* J.T.'s medical records concerning the prior sexual abuse. (*Id.* at 17-18.)

24   The State later filed a motion to clarify the ruling regarding the admissibility of J.T.'s

25   prior victimization and medical records, arguing they were irrelevant. (ECF No. 30-14 at

26   11-12.) At the hearing on the motion to clarify, the trial court ruled evidence of J.T.'s prior

27   mental harm, conflict with her mother, and previously running away from home, was

28   relevant and admissible, but evidence about the prior sexual abuse was not:

1
2

THE COURT: Okay. So, let's just skip on to the next motion. It's the State's motion for clarification, and this dealt with the issue of the victim in this case as far as prior medical records. And I think you're asking for clarification.

3
4
5
6
7

What I had ordered is the State has charged the Defendant with child abuse and neglect with substantial mental harm. So, obviously the mental condition of the victim is directly at issue, and it is relevant in this Court's opinion because the State is claiming that all the mental harm occurred as a result of the incidents involving the Defendant. So, it is relevant in this Court's opinion as to what her mental condition was prior to these events; you know, whether or not that perhaps some of the mental harm she's claiming from this incident predated this incident.

8
9
10

So, I was going to allow [the defendant] to get into that because it's directly at issue with the charges. What I did not find relevant is the fact that she may have had other cases in the system. I just don't see any exception where that would come in.

. . . .

11
12

[THE STATE]: It wasn't just the medical records and the psych records; it was the fact that she had been victimized before.

. . . .

13
14
15
16
17

THE COURT: [A]gain, I think that the mental health issues are relevant given the—what the State's p[l]ed in this particular case. I don't think it's relevant that she was a victim in another criminal case. I don't have any objection to [the defense] bringing up the fact that there was a conflict between the mother and daughter which led to the mother—I mean the daughter leaving the house, however, I don't think that [the defense] need[s] to get into the prior criminal case. You can simply—there can simply be—

18

THE DEFENDANT: I don't think I disagree with that.

19

THE COURT: —the fact that there was a conflict.

. . . .

20
21
22
23
24

THE COURT: You don't need to bring—I'm not going to let you bring up the prior criminal case. I'm not going to let you bring up the Defendant in the prior criminal case. I don't think that it's relevant. Because if you start bringing up this individual's name, the question for the jury is going to be who is this individual. The fact that there was mental health counseling prior, the fact that there was a conflict between the mother, I think that's relevant as well because it leads you into why she left the residence.

25

THE DEFENDANT: Absolutely.

26

THE COURT: But I don't think anything else regarding the prior case is relevant. So are we clear?

27

THE DEFENDANT: That's fine, that's fine. That's what I want.

28

(ECF No. 30-21 at 14-21.)

Sprowson later argued, however, that J.T.'s sexual relationship with other individuals was "pertinent," and excluding such evidence was prejudicial to the kidnapping charge. (*Id.*) The State clarified that it was not pursuing kidnapping under a theory that he intended to commit sexual assault. (*Id.*) The State clarified that, in its motion, it requested exclusion of J.T.'s sexual contact with any other people under the rape shield statute, and the trial court responded, "Well he disputes it's rape shield. And I don't think there's any of those cases that would be an exception to bring in a prior act." (*Id.* at 22.) Sprowson clarified he wished to elicit testimony about J.T.'s prior sexual history to avoid the State presenting J.T. "as this pristine virgin that has never been touched by anybody and somehow this predator came along and took advantage of her." (*Id.* at 22-23.) The trial court cautioned Sprowson, "There's very limited circumstances when you can bring up the victim's prior sexual history," and, "I would probably look at the rape shield statute because it is going to become relevant it sounds like during the course of the trial." (*Id.*)

Before opening statements, Sprowson stated he was "not going to get into any sexual history" but wanted to use J.T.'s medical records and a newspaper article to show her substantial mental harm was not caused by him alone and she had a history of running away and dating older men. (ECF No. 36-3 at 16-18.) The trial court pointed out the medical records were hearsay, and Sprowson stated he would use them as impeachment materials. (*Id.* at 19-20.) The State argued the trial court already ruled that, without getting into J.T.'s other relationships, Sprowson could establish causation by getting into the fact that she previously had therapy and was not completely healed after that therapy. (*Id.* at 21-22.) The trial court stated, "As far as her prior sexual relationships, there's got to be some nexus between that and how that relates to this offense," and, "The fact that she may have a thing for older guys, that alone does not have any relevance to what you're being charged with." (*Id.* at 19, 23-24.) Sprowson clarified he did not wish to present evidence of J.T.'s prior sexual conduct; he only wished to present evidence that there was a pattern of seeking out older men and running away from home because he did not want the jury to perceive him as responsible for enticing J.T. (*Id.* at 24-26.) The trial court

1    explained that Sprowson's action regarding J.T. "stands alone" and "just because some

2    other men may have engaged . . . in wrongful conduct with her, that doesn't make

3    [Sprowson's] conduct with her okay." (*Id.* at 26-27.) Sprowson argued a "pattern of

4    Stockholm Syndrome usually started with the first incident and then it—and then it kind

5    of builds up. So the reason is if it starts with me, then they've somehow got a case. But if

6    there's been some previous incidences with other men . . ." (*Id.* at 29.) The trial court

7    deferred changing its ruling depending on the evidence as it unfolded at trial. (*Id.* at 28-

8    29.)

9          During Sprowson's cross-examination of J.T., he asked whether her response to

10    his Craigslist post was the first time she ever answered a Craigslist ad. (ECF No. 37-1 at

11    193.) The State objected to the relevance of the question. (*Id.*) The trial court expressed

12    doubt about its relevance, and Sprowson replied that he would "skip it." (*Id.*)

13          Sprowson elicited J.T.'s testimony that she underwent therapy before she met him.

14    (*Id.* at 90.) He elicited J.T.'s testimony that she ran away from home twice before she ran

15    away with him. (*Id.*) J.T.'s mother testified she and J.T. had joint therapy, and J.T. had

16    individual therapy for two years before she met Sprowson, and, even before she ran away

17    with Sprowson, Smith had previously confiscated J.T.'s computer and telephone. (ECF

18    No. 38-1 at 35, 83.) One of J.T.'s therapists testified J.T. had a history of therapy for

19    anxiety, overwhelming emotions, and abandonment. (ECF No. 40-1 at 41.)

20          In closing, Sprowson argued: "[p]rior to meeting me she was receiving therapy,

21    prior to meeting me she was grounded for two years. Grounded for two years. Her phone

22    and her computer were taken away two years." (ECF No. 41-3 at 62, 64.) He argued the

23    State could not prove he caused J.T. mental harm because J.T. had "therapy, counseling"

24    before she met him. (*Id.* at 94-95.) He argued J.T. asked if he wanted a photograph of

25    her breast, and he did not need pictures because they could lawfully have sex. (ECF No.

26    41-3 at 76-77.)

27               **2.**    **Rights to Confrontation and to Present a Defense**

28          The Sixth Amendment's Confrontation Clause states: "In all criminal prosecutions,

1 the accused shall enjoy the right . . . to be confronted with the witnesses against him."

2 U.S. Const. amend. VI. "[A] primary interest secured by [the Confrontation Clause] is the

3 right of cross-examination." *Douglas v. State of Ala.*, 380 U.S. 415, 418 (1965); *see also*

4 *Md. v. Craig*, 497 U.S. 836, 845 (1990) ("The central concern of the Confrontation Clause

5 is to ensure the reliability of the evidence against a criminal defendant by subjecting it to

6 rigorous testing in the context of an adversary proceeding before the trier of fact."); *Davis*

7 *v. Alaska*, 415 U.S. 308, 316 (1974) ("Cross-examination is the principal means by which

8 the believability of a witness and the truth of his testimony are tested.").

9     "[A] criminal defendant states a violation of the Confrontation Clause by showing

10 that he was prohibited from engaging in otherwise appropriate cross-examination

11 designed to show a prototypical form of bias on the part of the witness," and "thereby 'to

12 expose to the jury the facts from which jurors . . . could appropriately draw inferences

13 relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680

14 (1986) (quoting *Davis*, 415 U.S. at 318).

15     While "the Confrontation Clause guarantees an *opportunity* for effective cross-

16 examination," it does not guarantee "cross-examination that is effective in whatever way,

17 and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679 (internal

18 quotation marks omitted) (emphasis in original). Trial courts "retain wide latitude insofar

19 as the Confrontation Clause is concerned to impose reasonable limits on such cross-

20 examination based on concerns about, among other things, harassment, prejudice,

21 confusion of the issues, the witness' safety, or interrogation that is repetitive or only

22 marginally relevant." *Id.* When a state evidence rule permits exclusion of evidence, a court

23 conducting a Confrontation Clause analysis must determine whether the restriction on the

24 right to confront the witness is "arbitrary or disproportionate" to the purposes the state

25 evidence rule is designed to serve. *See Michigan v. Lucas*, 500 U.S. 145, 151 (1991).

26     "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to

27 present a complete defense.'" *Crane v. Ky.*, 476 U.S. 683, 690-91 (1986). "[A] defendant's

28 right to present relevant evidence is not unlimited, but rather is subject to reasonable

25

restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "A defendant's interest in presenting such evidence may thus bow to accommodate other legitimate interests in the criminal trial process." *Id.* (internal quotation marks omitted). "As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id.* "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate' to the purposes they are designed to serve." *Id.* The Supreme Court has "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.* (citing *Rock v. Ark.*, 483 U.S. 44, 58 (1987) (holding state's per se rule excluding all hypnotically refreshed testimony infringed impermissibly on right to testify); *Chambers v. Miss.*, 410 U.S. 284, 302 (1973) (holding state hearsay rule, which did not recognize admission against penal interest exception, denied defendant a fair trial because it prevented defendant from introducing the testimony of three persons to whom a third party confessed to the murder for which defendant was on trial); and *Wash. v. Tex.*, 388 U.S. 14, 22-23 (1967) (holding defendant denied right to compulsory process because State arbitrarily denied him the right to present witness who was physically and mentally capable of testifying to events of which he had personally observed, and whose testimony was relevant and material to the defense)).

### 3.    State Court's Determination

The NSC determined evidence of J.T.'s prior interaction with older men and mental harm from those relationships was irrelevant to the kidnapping charge but determined such evidence was relevant to the child abuse charge and reversed that conviction:

*Exclusion of evidence*

[S]prowson argues that the district court violated his constitutional right to present a defense and cross-examine witnesses by excluding evidence regarding the victim's interaction with other men—specifically, the resulting mental harm from those relationships. We review a district court's decision to exclude evidence for an abuse of discretion. *Vega v. State*, 126 Nev. 332, 341, 236 P.3d 632, 638 (2010). "An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005) (internal quotation marks omitted). When the defendant

26

has preserved the error, we will not reverse the judgment of conviction if the error is harmless. *Newman v. State*, 129 Nev. 222, 236-37, 298 P.3d 1171, 1181-82 (2013). We will deem an error affecting a defendant's constitutional right to present a complete defense harmless only when we can determine, beyond a reasonable doubt, that the error did not contribute to the verdict. *Coleman v. State*, 130 Nev. 229, 243, 321 P.3d 901, 911 (2014).

Before meeting Sprowson, the victim engaged with another older man she met online. He was ultimately convicted for sexually assaulting the victim. That incident caused the victim to begin therapy. The district court granted in part the State's motion in limine and excluded all evidence of the victim's interaction with the other man, ruling that Sprowson could explore the victim's emotional distress and her previous therapy, but not "the why" behind it.

Sprowson argues that the victim's interaction with the other man was relevant to the kidnapping charge because it showed her history of meeting men online and running away to be with them, which undermined the State's enticement theory. We are not convinced that the victim's past was relevant to whether Sprowson willfully enticed the victim to leave her mother's home and go to his because it says nothing about the defendant's actions and consent is not a defense to first-degree kidnapping of a person under the age of 18. NRS 200.350(2); *see* NRS 48.015 (defining relevant evidence).

We conclude, however, that the evidence about the victim's relationship with the other man was relevant to the substantial-mental-harm element of the child abuse charge. *See* NRS 200.508 (defining abuse, neglect, or endangerment of a child and the penalties when substantial mental harm is involved). NRS 200.508(4)(e) defines "substantial mental harm" as "an injury to the intellectual or psychological capacity or the emotional condition of a child as evidenced by an observable and substantial impairment of the ability of the child to function within his or her normal range of performance or behavior." This language puts at issue the victim's state of mind when she met Sprowson. Yet, the district court precluded Sprowson from cross-examining the victim's doctor about the victim's past psychological damage after the doctor testified that only 5 to 10 percent of her patients require the type of long-term care that the victim required after her interaction with Sprowson. Further, the district court precluded Sprowson from impeaching the victim and her mother with medical documentation indicating that the victim's relationship with her 19-year-old boyfriend contributed to the victim's mental health issues subsequent to her interaction with Sprowson. *See Lobato v. State*, 120 Nev. 512, 518, 96 P.3d 765, 770 (2004) (noting that a witness's prior inconsistent statements may be used to impeach that witness). Indeed, the State's closing argument characterized the victim as a normal teenager with no issues until Sprowson came along and that he, alone, was responsible for any mental harm she suffered. NRS 200.508(4)(e). To assess the victim's "normal range of performance or behavior," the jury needed to know *why* the victim was in counseling, not just *that* she was in counseling. We cannot conclude, beyond a reasonable doubt, that these errors did not contribute

27

1
2
to the verdict on the child abuse count. *See Coleman,* 130 Nev. at 243, 321 P.3d at 911. We therefore reverse the conviction for child abuse and remand for a new trial on that charge.

3
(ECF No. 43-11 at 4-6.)

4
### 4.    Analysis of Ground 2(A)—Kidnapping

5
6
7
8
9
10
The NSC reasonably determined that, for purposes of the kidnapping charge, Sprowson's rights to confrontation and to present a defense were not violated by the exclusion of evidence that, before meeting Sprowson, J.T. engaged older men online and ran away from home to be with them. The NSC reasonably determined such evidence (1) says nothing about Sprowson's actions; and (2) a person under 18 years old cannot consent to be kidnapped.

11
12
13
14
15
16
17
In Nevada, relevant evidence "[m]eans evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." NRS § 48.015. Under NRS § 48.035, relevant evidence is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury," or if "its probative value is substantially outweighed by considerations of undue delay, waste of time or needless presentation of cumulative evidence."

18
The jury was instructed on the requirements of proving kidnapping:

19
20
Every person who leads, takes, entices, or carries away or detains any minor with the intent to

20
21
22
(1) Keep, imprison, or confine him or her from his or her parents, guardians, or any other person having lawful custody of the minor, or

22
23
(2) Perpetrate upon the person of the minor any unlawful act

is guilty of Kidnapping in the First Degree.

24
25
The intent to "keep" requires an intent to keep a minor from his or her parents, guardians, or any other person having lawful custody of the minor permanently or for a protracted period of time.

26
A person under the age of 18 cannot consent to being kidnapped.

27
A "minor" is a person less than 18 years of age.

28
(ECF No. 41-4 at 10-12.)

1    The State argued in closing that the evidence proved Sprowson had the requisite

2    intent in three ways. First, he had the intent to keep J.T. from her mother permanently or

3    for a protracted period. (ECF No. 41-3 at 13-14, 26-39.) Second, he had the intent to

4    perpetrate upon J.T. an unlawful act, i.e., (1) child abuse with substantial bodily harm,

5    and/or (2) contributing to the delinquency of a minor. (*Id.* at 38-48.) The jury was instructed

6    on requirements for the State to prove the separate charge of child abuse, which includes

7    proof Sprowson caused J.T. substantial mental harm. (*Id.* at 4, 14-16.)

8    The NSC reversed the child abuse conviction because the trial court erred by

9    excluding evidence of J.T.'s history of running away from home to be with men whom she

10   met online as relevant and admissible on the child abuse charge to prove Sprowson

11   caused J.T. substantial mental harm. Substantial mental harm was not a requisite

12   element for establishing the charge of kidnapping. It was reasonable to conclude that

13   such evidence did not tend to make any fact of consequence to the determination of

14   whether the State proved kidnapping—distinct from the child abuse charge—more or less

15   probable than it would be without the evidence. Such evidence did not tend to prove

16   anything about Sprowson's actions for purposes of kidnapping. And, because J.T. was

17   16 years old at the time of the offenses, it was objectively reasonable for the NSC to

18   conclude evidence of J.T.'s history of running away from home to be with men whom she

19   met online was not relevant to establish that J.T. went willingly with Sprowson as her age

20   foreclosed a consent defense. Sprowson claims the evidence would have affected J.T.'s

21   credibility; however, J.T. admitted she willingly went to Sprowson's home and that she

22   was free to leave at any time. Thus, the NSC reasonably concluded the exclusion of the

23   evidence with respect to the kidnapping charge did not violate Sprowson's rights to

24   confrontation and to present a defense.[11]

25

26   ---

     [11]Sprowson argues in his reply brief that the evidence of J.T.'s past was relevant
     to establish that she was not taken against her will for purposes of the kidnapping charge.

27   (ECF No. 94 at 43.) The NSC previously held "kidnap" means to take and carry away any
     person by unlawful force or fraud and against his will. *See, e.g.*, *Burkhart v. State*, 820

28   P.2d 757 (Nev. 1991); *McDonald v. Sheriff of Carson City*, 512 P.2d 774 (Nev. 1973);
     *(fn. cont…)*

1    The Court denies Ground 2(A) because the NSC's determination is neither

2    contrary to nor constitutes an unreasonable application of clearly established federal law

3    as determined by the Supreme Court, nor is it based on an unreasonable determination

4    of fact.

5            **5.    Analysis of Ground 2(B)—Child Pornography**

6            Sprowson argues he was denied the rights to confrontation and to present a

7    defense when the trial court precluded him from asking J.T. whether she previously sent

8    a photograph of her breast to another man whom she met online. He claims this ruling

9    prevented him from impeaching J.T.'s credibility because it would have undermined her

10   testimony that Sprowson directed her to take the photographs used to support the child

11   pornography charges. (ECF No. 21 at 12.)

12           The state record demonstrates Sprowson fairly presented this claim to the NSC.

13   (ECF No. 43-1 at 39; ECF No. 43-7 at 30-31.) Sprowson has not, however, rebutted the

14   presumption that the state court adjudicated the claim on the merits where, as here, the

15   claim was fairly presented, and the state court addressed a related claim[12] but did not

16   expressly acknowledge the claim. *See Johnson*, 568 U.S. at 298-01. The NSC

17   adjudicated the claim on the merits, so the Court engages in "an independent review of

18   the record" to determine whether the state court's decision on the claim was "objectively

19   unreasonable," i.e., by determining "what arguments could have supported the state

20   _____

21   *Jensen v. Sheriff, White Pine Cnty.*, 508 P.2d 4, (Nev. 1973). However, the plain language
     of the kidnapping statute, NRS § 200.310, fails to include a requirement that an individual
22   must be taken against their will. Sprowson did not request an instruction directing the jury
     that J.T. had to be kidnapped against her will, and the jury was not given any such
23   instruction. (ECF No. 41-1; ECF No. 41-4 at 10-11.) Sprowson failed to make this
     argument in either his direct appeal or as part of his state post-conviction review
24   proceedings. (ECF No. 43-1.) Accordingly, the Court may not entertain the argument.

25           [12]The NSC relatedly determined: "[S]prowson argues that the child pornography
     convictions require reversal because (1) he did not 'produce a performance' according to
26   NRS § 200.710, (footnote omitted) with a photograph that he claimed was taken before
     he knew the victim . . . We reject [this] argument because Sprowson questioned the victim
27   regarding the alleged preexisting photograph, she denied that it predated their
     relationship, and the jury was not required to credit Sprowson's conflicting testimony."
28   (ECF No. 43-11 at 7.)

1   court's decision and assess whether fairminded jurists could disagree [over] whether

2   those arguments are unreasonable" or inconsistent with a holding in a prior decision of

3   the Supreme Court. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

4          The NSC could have reasonably concluded that Sprowson failed to establish any

5   basis to find a violation of his rights to confrontation and to present a defense, as he does

6   not demonstrate that he could have impeached J.T. with evidence that she previously

7   sent the photograph to another man. During cross-examination, Sprowson asked J.T.,

8   "Do you remember the conversation that we had and you had asked me if I wanted a

9   picture that you had taken of your breasts. Do you remember that conversation?" (ECF

10   No. 37-1 at 112.) J.T. responded, "No, I don't remember that." (*Id.*) Sprowson asked, "Did

11   you ever ask me if I wanted a breast picture?" (*Id.* at 140.) She again answered, "No."

12   (*Id.*) Sprowson asked J.T., "So the first time—so are you saying that you never took any

13   kind of picture like this prior to meeting me?" (*Id.*) J.T. replied, "Yes. That was my first

14   time." (*Id.* at 140-41.) Sprowson presents no evidence the photograph in fact predated

15   their relationship.[13] The record reflects that Sprowson was not prevented from asking J.T.

16   whether she took a photo of her breasts before meeting him, and he has not shown any

17   basis to conclude that questioning her about a prior encounter with another man would

18   have led to an admission that she took the photos earlier.

19          The Court denies Ground 2(B) because the NSC's determination is neither

20   contrary to nor constitutes an unreasonable application of clearly established federal law

21   as determined by the Supreme Court and is not based on an unreasonable determination

22   of fact.

23          **C.     Ground 3**

24          Sprowson alleges there is insufficient evidence of "sexual conduct" or,

25

26   _____

          [13]The State's Exhibits 24-28 bear no date indicating when the photographs were

27   taken, and the State's forensic expert did not provide any testimony indicating the date
     when the photographs were taken; the expert, however, stated photographs removed

28   from Sprowson's telephone had meta data dated August 24, 2013 at 9:57 a.m. (ECF No.
     39-1 at 60; ECF No. 102-04; 84.)

1    alternatively, "sexual portrayal" to convict him of Counts 3 and 5 under NRS §§ 200.700(3)

2    and (4) and §§ 200.710(1) and (2) in violation of the Fifth, Sixth, and Fourteenth

3    Amendments. (ECF No. 21 at 13-14; ECF No. 94 at 45-53.) Respondents argue there is

4    sufficient evidence to convict Sprowson of the charges. (ECF No. 70 at 17-19.)

5                        **1.    Additional Background**

6         The information charged Sprowson "did . . . willfully, unlawfully, feloniously, and

7    knowingly, use, encourage, entice or permit J.T. a minor, to (1) simulate or engage in

8    sexual conduct to produce a performance, and/or (2) be the subject of a sexual portrayal

9    in a performance under NRS § 200.700(3) & (4) and §§ 200.710(1) & (2)." (ECF No.

10   26-2 at 3-4.) The State argued at trial that J.T. testified she created photographs and sent

11   them to Sprowson after he instructed her how to pose and requested nude photographs

12   and photographs of her crotch and buttocks. (ECF No. 41-3 at 48-56.) The State argued

13   State's Exhibit 25 (depicting J.T. bent over a chair in her underwear exposing her

14   buttocks) and State's Exhibit 28 (depicting J.T. in her underwear with her legs spread)

15   supported Count 3. (*Id.*) The State argued that State's Exhibit 24 (depicting J.T. in her

16   underwear with her legs spread) supported Count 5. (*Id.*)

17                        **2.    Sufficiency of Evidence**

18        "[T]he Due Process Clause protects the accused against conviction except upon

19   proof beyond a reasonable doubt of every fact necessary to constitute the crime with

20   which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner

21   faces a "considerable hurdle" when challenging the sufficiency of evidence to support a

22   conviction. *See Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). A jury's verdict

23   must stand if "after viewing the evidence in the light most favorable to the prosecution,

24   *any* rational trier of fact could have found the essential elements of the crime beyond a

25   reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

26   A reviewing court "faced with a record of historical facts that supports conflicting

27   inferences must presume—even if it does not affirmatively appear in the record—that the

28   trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that

                                        32

resolution." *Davis*, 384 F.3d at 639 (quoting *Jackson*, 443 U.S. at 326). The *Jackson* standard applies "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* (quoting *Jackson*, 443 U.S. at 324 & n.16).

NRS § 200.710 is titled "unlawful to use minor in producing pornography or as subject of sexual portrayal in performance" and states:

> 1. A person who knowingly uses, encourages, entices or permits a minor to simulate or engage in or assist others to simulate or engage in sexual conduct to produce a performance is guilty of a category A felony and shall be punished as provided in NRS 200.750.
>
> 2. A person who knowingly uses, encourages, entices, coerces or permits a minor to be the subject of a sexual portrayal in a performance is guilty of a category A felony and shall be punished as provided in NRS 200.750, regardless of whether the minor is aware that the sexual portrayal is part of a performance.

[A] "minor" is a person less than 18 years of age. *See* NRS § 129.010. "Performance" means, among other things, a photograph or other visual presentation. *See* NRS § 200.700(1). "Sexual conduct" means "sexual intercourse, lewd exhibition of the genitals, fellatio, cunnilingus, bestiality, anal intercourse, excretion, sado-masochistic abuse, masturbation, or the penetration of any part of a person's body or of any object manipulated or inserted by a person into the anal opening of the body of another." NRS § 200.700(3). "Sexual portrayal" is "the depiction of a person in a manner which appeals to the prurient interest in sex and which does not have serious literary, artistic, political or scientific value." NRS § 200.700(4). The Supreme Court has defined "prurient" as "a shameful or morbid interest in nudity, sex, or excretion" or involving *"*sexual responses over and beyond those that would be characterized as normal." *Brockett v. Spokane Arcades*, *Inc.*, 472 U.S. 491, 498 (1985) (internal quotation marks omitted); *see also Shue v. State*, 407 P.3d 332, 338 (Nev. 2017) (explaining "prurient" as used in NRS § 200.700(4) "plainly defines sexual portrayal as the depiction of a minor in a manner that appeals to a shameful or morbid interest in the sexuality of the minor, and which does not have serious literary, artistic, political, or scientific value, according to the views of an average person applying contemporary community standards").

### 3.    State Court's Determination

The NSC determined there was sufficient evidence to establish the alternative charge of unlawful use of minor as subject of sexual portrayal in performance:

*Child pornography counts*

[S]prowson argues that the child pornography convictions require reversal because (1) he did not "produce a performance," according to NRS 200.710,

[FN 1] NRS 200.710 states:

1.    A person who knowingly uses, encourages, entices or permits a minor to simulate or engage in or assist others to simulate or engage in sexual conduct to produce a performance is guilty of a category A felony and shall be punished as provided in NRS 200.750.

2.    A person who knowingly uses, encourages, entices, coerces or permits a minor to be the subject of a sexual portrayal in a performance is guilty of a category A felony and shall be punished as provided in NRS 200.750, regardless of whether the minor is aware that the sexual portrayal is part of a performance.

with a photograph that he claimed was taken before he knew the victim; (2) the photographs did not show "sexual conduct" or involve a "sexual portrayal"; and/or (3) the child pornography statute is unconstitutional. We reject the first argument because Sprowson questioned the victim regarding the alleged preexisting photograph, she denied that it predated their relationship, and the jury was not required to credit Sprowson's conflicting testimony. We also reject the second argument because the photographs show the minor victim staged in sexually suggestive positions, thus depicting her "in a manner which appeals to the prurient interest in sex and which does not have serious literary, artistic, political or scientific value." NRS 200.700(4) (defining "sexual portrayal"); *see also Shue v. State*, 133 Nev. 798, 805, 407 P.3d 332, 338 (2017) (explaining that a "prurient" interest in sex involves "'a shameful or morbid interest in nudity, sex, or excretion,' or involving 'sexual responses over and beyond those that would be characterized as normal'" (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498 (1985)). Sprowson's argument that the photographs did not appeal to a prurient interest in sex because the victim was his girlfriend and was of legal age to consent to sex is without merit. *See Shue*, 133 Nev. at 805, 407 P.3d at 338 (reiterating that what is prurient depends on "the views of an average person applying contemporary community standards"); *State v. Hughes*, 127 Nev. 626, 630, 261 P.3d 1067, 1070 (2011) (rejecting the argument that a minor under the age of 18 but of legal age to consent cannot be the subject of child pornography). Because the jury could reasonably find that the photographs depicted the minor victim as the subject of a "sexual portrayal," the evidence is sufficient to support the child

34

pornography convictions under NRS 200.710(2). Thus, we need not determine whether the evidence is sufficient to support those convictions on the alternative theory that the photographs showed "sexual conduct" for purposes of NRS 200.710(1).

(ECF No. 43-11 at 7-8.)

#### 4.    Analysis of Ground 3

The NSC reasonably applied *Jackson* in concluding that sufficient evidence supports the convictions for using a minor as the subject of sexual portrayal in performance under NRS § 200.710(2) and (4). *See* 443 U.S. 307 (1979). The state court record demonstrates a rational jury could find Sprowson knowingly encouraged, enticed, or permitted J.T., a minor, to take the photographs that supporting Counts 3 (State's Exhibits 25 and 28) and 5 (State's Exhibit 24) and that the photographs depict J.T. as the subject of a "sexual portrayal." (*See* ECF No. 84.) J.T. testified Sprowson directed her to take the photographs of herself in different poses, including partially nude photographs and photographs of her nude breasts, closeups of her crotch with her legs spread open exposing her pubic hair and emphasizing her vaginal area, and a photograph of her buttocks while she bent over a chair. A rational juror could conclude Sprowson encouraged and permitted J.T. to be the subject of the photographs. *See Rose v. State*, 163 P.3d 408, 414 (Nev. 2007) ("[W]e have held that the victim's testimony alone is sufficient to uphold a conviction."). And, because the photographs depict close-ups of J.T.'s crotch with her legs spread, posing bent over a chair exposing her buttocks, and her nude breasts, a rational juror could conclude the photographs were, under the circumstances, directed to appeal to a prurient interest in sex and were without serious literary, artistic, political, or scientific value.

Sprowson argues the photographs did not appeal to "prurient" interests because the photographs were taken in the context of a lawful romantic relationship with J.T. and therefore could not depict "a shameful or morbid interest in nudity, sex or excretion" or involve "sexual responses over and beyond those that would be characterized as normal." Sprowson's jury was not given a definition of "prurient"; however, neither party requested

1    an instruction providing a definition of "prurient." The State argued in closing that the

2    photographs appealed to a prurient interest, and Sprowson argued they did not. Because

3    a reviewing court "faced with a record of historical facts that supports conflicting

4    inferences must presume—even if it does not affirmatively appear in the record—that the

5    trier of fact resolved any such conflicts in favor of the prosecution and must defer to that

6    resolution," the NSC's determination was objectively reasonable. *See Davis*, 384 F.3d at

7    639 (quoting *Jackson*, 443 U.S. at 326).

8        The Court denies Ground 3 because the NSC's determination is neither contrary

9    to nor constitutes an unreasonable application of clearly established federal law as

10   determined by the Supreme Court, nor is it based on an unreasonable determination of

11   fact.

12       **D.    Ground 4**

13       Sprowson alleges his four convictions for use of a minor as a subject of sexual

14   portrayal in performance under NRS § 200.710(2) are unconstitutional in violation of the

15   First, Fifth, Sixth, and Fourteenth Amendments because NRS § 200.700(4) is

16   unconstitutional. (ECF No. 21 at 14-15.) He argues the statute should not extend to the

17   images here because doing so would render it unconstitutionally vague. (*Id.*) He contends

18   that, because the photographs were taken after J.T. became his girlfriend and because

19   she could consent to sexual intercourse at 16 years of age, NRS § 200.700(4)'s definition

20   of "sexual portrayal" is unconstitutional in that it fails to provide notice of what conduct,

21   activity, or imagery is prohibited and lacks any objective standards to guide law

22   enforcement. (*Id.*) Moreover, he argues NRS § 200.700(4) is unconstitutional because it

23   is overly broad, vague, and not narrowly tailored. (*Id.*) He argues the statute's focus is on

24   the image's effect on the viewer, not whether the intent underlying its creation is lawful.

25   (*Id.*) Respondents contend: (1) child pornography is not protected speech under the First

26   Amendment; (2) NRS § 200.700(4) is not unconstitutionally vague or overbroad on its

27   face; (3) the statute is not unconstitutional as applied to Sprowson's case; and (4)

28   Sprowson fails to show the NSC unreasonably applied Supreme Court precedent. (ECF

No. 70 at 20-23.)

### 1.    Constitutionality of State Statute

The Due Process Clause prohibits the Government from "'taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" *Beckles v. United States*, 580 U.S. 256, 262 (2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983)).

"The First Amendment, which applies to the States through the Fourteenth Amendment, prohibits laws 'abridging the freedom of speech'" and "[a]s 'a general matter,' this provision 'means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 2291, 2302 (2025) (quoting *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002)) (internal quotation marks omitted). Certain "historic and traditional categories of speech"—"such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—have been understood to fall outside the scope of the First Amendment." *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 468 (2010)) (internal quotation marks and citations omitted). "Such prohibitions are subject only to rational-basis review, the minimum constitutional standard that all legislation must satisfy." *Id.* (citing *D.C. v. Heller*, 554 U.S. 570, 628 & n.27 (2008)). "Under that standard, a law will be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis' for its enactment." *Id.* (quoting *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

In *N.Y. v. Ferber*, the Supreme Court held that child pornography is not entitled to First Amendment protection, provided the prohibited conduct is (1) "adequately defined by the applicable state law, as written or authoritatively construed," (2) "limited to works that visually depict sexual conduct by children below a specified age," (3) suitably limited and describes "the category of sexual conduct proscribed," and (4) requires "scienter on

37

the part of the defendant." 458 U.S. 747, 764-65 (1982). In *Ferber*, the Court determined a New York statute that prohibited knowingly promoting sexual performance by children under the age of 16 by distributing material which depicts such performances was not overbroad. *Id.* at 749, 773. The Supreme Court provided multiple reasons why states are "entitled to greater leeway in the regulation of pornographic depictions of children." *Id.* at 756. The first is that "a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling,'" "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance," and "the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child." *Id.* at 756-58. Second, "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways: (1) the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation; and (2) the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Id.* at 759. The Supreme Court noted one authority's position: "[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution," and when "[t]he child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place," such that "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography." *Id.* at 760 & n.10. Third, "[t]he advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation," and "[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Id.* at 761-62. Fourth, "[t]he value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not de minimis." *Id.* Fifth, "[r]ecognizing and classifying child pornography as a

1  category of material outside the protection of the First Amendment is not incompatible

2  with [the Supreme Court's] earlier decisions." *Id.* at 763.

3        The Supreme Court later clarified that, "*Ferber*'s judgment about child pornography

4  was based upon how it was made, not on what it communicated," and "reaffirmed that

5  where the speech is neither obscene nor the product of sexual abuse, it does not fall

6  outside the protection of the First Amendment." *Ashcroft*, 535 U.S. at 250-51 (citing

7  *Ferber*, 458 U.S. at 764-65 ("[T]he distribution of descriptions or other depictions of sexual

8  conduct, not otherwise obscene, which do not involve live performance or photographic

9  or other visual reproduction of live performances, retains First Amendment protection.")).

10        In *United States v. Stevens*, the Supreme Court concluded a federal statute

11  criminalizing the commercial creation, sale, or possession of certain depictions of animal

12  cruelty was substantially overbroad and facially invalid under First Amendment strict

13  scrutiny analysis. *See* 559 U.S. at 464. The statute did not address underlying acts

14  harmful to animals. *See id.* The government argued depictions of animal cruelty should

15  be added to the list of depictions, like child pornography, that are categorically

16  unprotected under the First Amendment, based on a cost-benefit analysis. *See id.* at 469.

17  The Supreme Court rejected that argument, stating that, when it identified categories of

18  speech as fully outside the protection of the First Amendment, it was not based on a

19  simple cost-benefit analysis. *See id.* at 471. The Court referenced, as an example,

20  *Ferber*'s holding that child pornography is "fully outside the protection of the First

21  Amendment." *Id.* at 471. The Supreme Court stated that, in *Ferber*, it noted the state had

22  a compelling interest in protecting children from abuse and that the value of using children

23  in child pornography works was *de minimis*, but its decision did not rest on that "balance

24  of competing interests." *See id.* The Court stated that it made clear *Ferber* presented a

25  special case: the market for child pornography was "intrinsically related" to the underlying

26  abuse and was therefore "an integral part of the production of such materials, an activity

27  illegal throughout the Nation." *See id.* at 759, 761. The Court noted, "'It rarely has been

28  suggested that the constitutional freedom for speech and press extends its immunity to

speech or writing used as an integral part of conduct in violation of a valid criminal statute.'" *Id.* at 761-62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)). The Supreme Court explained that *Ferber's* analysis was grounded in a previously recognized, long-established category of unprotected speech. *See id.* (first citing *Osborne v. Ohio*, 495 U.S. 103, 110 (1990) (describing *Ferber* as finding "persuasive" the argument that the advertising and sale of child pornography was "an integral part" of its unlawful production) (internal quotation marks omitted); and then citing *Ashcroft*, 535 U.S. 249-50 (noting distribution and sale "were intrinsically related to the sexual abuse of children," giving the speech at issue "a proximate link to the crime from which it came") (internal quotation marks omitted)); *see also Counterman v. Colo.*, 600 U.S. 66, 101 & n.8 (2023) (noting child pornography has "integral ties to separate criminal conduct").

In *Shue v. State*, the NSC considered a case where the defendant was convicted of surreptitiously recording his then-girlfriend's minor children naked in the bathroom performing bathroom activities and of taking an up-skirt photo of one of the children. *See* 407 P.3d 322, 339 (Nev. 2017). The NSC held that Shue's conduct is clearly proscribed in the definition of "sexual portrayal" set forth in NRS § 200.700(4)'s plain language and does not implicate First Amendment protection. *See id.* at 339 (citing *Ferber*, 458 U.S. at 757 (providing "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance," and the Supreme Court has therefore "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights")). The NSC, moreover, concluded that "sexual portrayal" set forth in NRS § 200.700(4) and § 200.710(2) is not unconstitutionally vague on its face or as applied to *Shue*'s facts under the Due Process Clause, as the phrase "which does not have serious, literary, artistic, political or scientific value" sufficiently narrows the definition of "sexual portrayal" to avoid the proscription of innocuous photographs of minors. *See id.* at 338-39 & n.10.

40

1    In *Sena v. State*, 510 P.3d 731, 750-51 & n.16 (Nev. 2022), the NSC held the

2    Supreme Court's *Stevens* decision "does not compel this court to reconsider" *Shue*'*s*

3    holding that NRS § 200.700(4) and § 200.710(2) are constitutional because "*Stevens* did

4    not invalidate the holding in *Ferber*, nor is it incongruous with the holding in *Shue*; rather,

5    *Stevens* only distinguished 'depictions of animal cruelty' from child pornography when

6    contemplating whether each category was protected by the First Amendment." *Id.* at 751.

7    The NSC reaffirmed *Shue*'*s* holding that NRS § 200.700(4) and § 200.710(2) are

8    constitutional. *Id.*

9                    **2.    State Court Determination**

10    On direct appeal, the NSC—citing its decision in *Shue*—rejected Sprowson's

11    constitutional challenge to Nevada's statutory definition of "sexual portrayal" under NRS

12    § 200.700(4), ruling that the definition does not implicate First Amendment protections,

13    sufficiently narrows the statute's application to avoid vagueness, and is neither vague nor

14    overbroad. The NSC, moreover, ruled it need not reconsider its decision in *Shue* because,

15    contrary to Sprowson's claim, the Supreme Court's decision in *Stevens* does not hold that

16    only productions connected to independent criminal conduct may be considered child

17    pornography:

18            "[N]or can we credit Sprowson's argument that Nevada's statutory
       definition of "sexual portrayal" is unconstitutionally vague or overbroad. *See*
19       *Shue*, 133 Nev. at 805-07, 407 P.3d at 338-39 (concluding Nevada's
       statutes barring the sexual portrayal of minors are not overbroad because
20       the type of conduct proscribed under NRS 200.700(4) does not implicate
       the First Amendment's protection and sufficiently narrows the statute's
21       application to avoid vagueness). Sprowson's argument that *Shue* should be
       revisited because it did not discuss *United States v. Stevens*, 559 U.S. 460
22       (2010), is unavailing. *Stevens* does not stand for the proposition that only
       productions connected to independent criminal conduct will be considered
23       child pornography, as Sprowson suggests." 559 U.S. at 470.
24

25    (ECF No. 43-11 at 8-9.)

26                    **3.    Analysis of Ground 4**

27    Sprowson argues the Court owes no deference to the NSC's determinations

28    because the NSC failed to adjudicate his claim that "sexual portrayal" is void for

                                         41

vagueness. The Court finds the NSC properly adjudicated the claim by expressly stating it could "not credit Sprowson's argument that Nevada's statutory definition of sexual portrayal is unconstitutionally vague." Moreover, Sprowson has not rebutted the presumption that the NSC adjudicated the claim on the merits where, as here, the claim was fairly presented, and the state court addressed related claims. *See Johnson*, 568 U.S. at 298-301. The Court therefore concludes the NSC adjudicated the claim and will deferentially review the claim under AEDPA.

The Court finds the NSC reasonably concluded the definition of "sexual portrayal" established in NRS § 200.710(2) and § 200.700(4) is not void for vagueness or overbreadth, as the provisions give ordinary people and law enforcement fair notice of the punishable conduct and are not so standardless so as to invite arbitrary enforcement. A sexual portrayal must involve an individual who is a minor, which is defined in Nevada as under 18 years of age. A defendant must "use, encourage, entice, coerce or permit" a person under 18 years of age as the subject of a performance. A performance includes photographs. The actions require scienter, i.e., the actions proscribed must be done "knowingly." Finally, the statute defines "sexual portrayal" as a depiction of a person in a manner which appeals to the prurient interest in sex and excludes depictions that do not have serious literary, artistic, political, or scientific value.

Sprowson argues the phrase, "prurient interest" is ambiguous, but he did not request an instruction providing a specific definition for that phrase to the jury. (ECF No. 41-1.) Instead, Sprowson exploited the lack of a more specific definition by arguing in closing that "prurient interest" was "subjective" and the photographs did not appeal to his own prurient interest. *See Smith v. United States*, 431 U.S. 291, 308 (1977) (holding that the application of community standards to determine that conduct appeals to prurient interests is a "question[] for the jury to decide, in its traditional role as factfinder").

Sprowson claims the statutes are vague and overbroad because the photographs of J.T. are no more prurient than photographs of children wearing underwear in store catalogs. However, as the NSC stated in *Shue*, the phrase "which does not have serious,

42

1    literary, artistic, political or scientific value" sufficiently narrows the definition of "sexual

2    portrayal" to avoid the proscription of innocuous photographs of minors. Moreover,

3    Sprowson did not produce a single store catalog photograph depicting close-up

4    photographs of a child's crotch wearing panties with her legs spread, leaning over a chair

5    while wearing panties and exposing her buttocks, or depicting her nude breasts and

6    buttocks. Although Sprowson concedes an up-skirt photograph taken of a minor in the

7    *Shue* case "clearly appeals to a prurient interest in sex and has no literary, artistic, or

8    political value," he fails to acknowledge the photograph of J.T. bending over a chair

9    exposing her buttocks, the close-up photographs of J.T.'s crotch, and the photos of her

10   naked breasts similarly appeal to a prurient interest in sex with a minor. It is reasonable

11   to conclude that no ordinary person or law enforcement officer would mistake a catalog

12   photograph of a child in her underwear as a violation of the statute; likewise, none would

13   reasonably find non-prurient a close-up photograph emphasizing a minor's crotch with

14   her legs open or a photograph of a minor bent over a chair exposing her buttocks, albeit

15   wearing underwear, or photographs of a minor's naked breasts.

16          Sprowson argues the statutes are unconstitutional because they are arbitrary in

17   that J.T. was not prosecuted for taking and sending him photographs that she considered

18   to be "sexy." The photographs underlying his convictions were not the photographs that

19   J.T. thought were sexy. The photographs underlying the convictions were the

20   photographs of J.T.'s crotch, buttocks, and breasts in various poses, which, according to

21   J.T., Sprowson directed her to capture on film and send to him. The photographs that J.T.

22   took of herself as "sexy" were consistent with underwear advertisements in store catalogs

23   and websites for children's clothing, and Sprowson did not find them sexy, thus,

24   prompting his direction that J.T. supply him with other photographs depicting her crotch,

25   buttocks, and breasts. Sprowson fails to establish the statute is capable of arbitrary

26   enforcement or that J.T. was liable under the plain language of the statutes under which

27   he was convicted.

28          Sprowson claims the statute is vague as applied to his case because an adult in

Nevada may have consensual sex and a romantic relationship with an individual who is 16 years old. *See* NRS § 200.364. The plain language of NRS § 200.700(4) and § 200.710(2) does not prohibit consensual sex with a 16-year-old. Those statutes instead unambiguously provide that it is a criminal act, for instance, to encourage or permit a person under 18 years of age as the subject of a "sexual portrayal" i.e., appear in a photograph in a manner that appeals to a prurient interest in sex, which does not have serious literary, artistic, political, or scientific value. Even where an individual has a romantic interest or may have consensual sex with a 16-year-old off-camera, the statutes clearly disallow certain prescribed conduct on-camera with an individual who is under 18.

Sprowson argues the statutes are unconstitutional under the First Amendment because the NSC unreasonably failed to apply *Stevens* and hold the statute to strict scrutiny. Sprowson argues J.T. could, as a 16-year-old in Nevada, legally consent to have sexual intercourse; therefore, the photographs were not made as "an integral part of conduct in violation of a valid criminal statute" under *Ferber* and *Stevens*. The NSC, however, reasonably determined *Stevens* does not stand for the proposition that productions under the Nevada statutes must be connected to independent criminal conduct to be considered child pornography. It is reasonable to conclude, "Given the permanency of a visual depiction, it was rational for the Legislature to conclude that participation in pornography memorializing a sexual encounter requires greater maturity from the participants than does the choice to engage in sexual relations." *State v. Hughes*, 261 P.3d 1067, 1070 (Nev. 2011). Moreover, the independent criminal act may reasonably be construed to include the production of a sexual portrayal of a minor as proscribed by the statute even if the acts depicted are in fact legal. *See, e.g.*, *People v. Hollins*, 971 NE.2d 504, 506 (Ill. 2012) (holding child pornography statute prohibiting photographing or videotaping minors engaged in sexual activity did not violate due process, even though the victim was 17, and the age of consent for sexual activity was also 17; reasoning that raising the age to 18 was a reasonable means of accomplishing legitimate government purpose of protecting children from sexual abuse and exploitation;

1  holding that prohibition bore a rational relationship to the purpose, as it aided the State in

2  enforcing child pornography laws, and there were rational, reasonable arguments in

3  support of having a higher age threshold for appearance in pornography than for consent

4  to sexual activity). Thus, under AEDPA, the NSC's failure to consider the explanation in

5  *Stevens* for the decision in *Ferber* is not objectively reasonable.

6  Assuming arguendo the NSC was objectively unreasonable in its application of

7  *Ferber* or *Stevens*, and applying *de novo* review, the Court would conclude that NRS §

8  200.700(4) and § 200.710(2) are "intrinsically related to the unlawful production of"

9  images that are "categorically unprotected under the First Amendment" and that the

10  statutes are constitutional because, under rational basis review, there are reasonably

11  conceivable facts supporting a rational basis for their enactment. *See Berghuis v.*

12  *Thompkins*, 560 U.S. 370, 390 (2010) (holding that, because *de novo* review is more

13  favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254

14  by engaging in *de novo* review rather than applying the deferential AEDPA standard).

15  When determining whether an image is unprotected by the First Amendment, "[t]he

16  underlying inquiry is whether [it] implicates the interests of an actual minor." *See Ferber*,

17  458 U.S. at 764-65. Consensual sexual relations with a 16-year-old and encouraging and

18  permitting a minor to appear in a "sexual portrayal" are very different acts. *See id.* at 759

19  (distinguishing the acts of child abuse and the abuse involved in producing child

20  pornography and noting the latter constitutes "a permanent record of the children's

21  participation"); *see also Hughes*, 261 P.3d at 1070 (citing *State v. Senters*, 699 N.W.2d

22  810, 817 (Neb. 2005) (concluding that, while a person may be old enough to consent to

23  sexual relations, the legislature could rationally conclude an individual might not

24  appreciate the ongoing effect of participation in pornography, thus, justifying the

25  discrepancy in ages between the statutes)); *see also Hollins*, 971 NE.2d at 506. Here, the

26  underlying abuse is encouraging and facilitating the creation of a permanent record of

27  J.T. in photographs depicting her as the subject of a "sexual portrayal." Moreover, the

28  prohibition bore a rational relationship to the purpose of protecting minors from sexual

1    exploitation. Although Sprowson contends the photographs were not distributed, he

2    caused them to be produced and distributed to himself. *See Ferber*, 458 U.S. at 760 &

3    n.10 (acknowledging an authority who explained that pornography poses an even greater

4    threat to the child victim than sexual abuse or prostitution because the child's actions are

5    captured in a permanent recording that can continue to affect her in the future).

6         The Court denies Ground 4 because the NSC's determinations are neither contrary

7    to nor constitute an unreasonable application of clearly established federal law as

8    determined by the Supreme Court and are not based on an unreasonable determination

9    of fact.

10        **E.     Ground 5**

11        Sprowson alleges prosecutorial misconduct in violation of the Fifth, Sixth, and

12   Fourteenth Amendments. (ECF No. 21 at 15-19.) He argues the State engaged in

13   misconduct in three ways: (A) by intentionally making inflammatory statements that

14   prejudiced the selected jurors during the State's introduction in *voir dire*; (B) in closing

15   remarks by impermissibly arguing a limited concept of "grooming" gleaned from the

16   statements of a prospective juror during *voir dire*; and (C) by impermissibly commenting

17   on Sprowson's Confrontation Clause rights by remarking about J.T.'s stress and anxiety

18   due to Sprowson's exercise of his right to trial. (*Id.*)

19        **1.     Additional Background**

20        At jury selection, the State gave an introductory overview of the case:

21        [THE STATE]: Thank you, Judge. Good afternoon, ladies and gentlemen,
     we're deputy district attorneys with the Clark County DA's Office assigned
22   to case—or prosecute the subject case captioned State versus Melvyn
     Sprowson wherein the Defendant's charged with first degree kidnapping,
23   child abuse and neglect with substantial bodily harm, and unlawful use of
     minor in the production of pornography.
24
          Specifically, it's alleged that between July 1st, 2013, and November
25   1st of 2013, Melvyn Sprowson, the Defendant, at the age of about 44,
     developed a sexual relationship with 16-year-old girl by the name of J.T.
26   Contact was initially made on Craigslist over the Internet and that
     progressed to a continued contact between the Defendant and—and this
27   child over the Internet and by phone in which the Defendant asked J.T. to
     be his girlfriend, which progressed to the Defendant causing J.T. to take
28

nude and sexually explicit photos of herself and send them to the Defendant over the computer through the Internet; and which lead to the Defendant picking up J.T. from her home, the home she shared with her mother, her sister and her grandmother in the middle of the night while her family slept, and taking her to live at his house for an extended period of time while J.T.'s family searched for her.

Now, J.T. was at the Defendant's residence, residing for approximately nine weeks, and during which this—over this period of time J.T. was completely isolated from any contact with her parents or anyone else, not attend school, slept in the same bed as the Defendant and was caused to perform sexual acts. And this continued over this period of about nine weeks until the police found the child at that residence.

(ECF No. 34-2 at 132-34.)

The State subsequently asked the venire whether any of them "had a strong reaction or gut reaction right away" to the State's introduction; eight prospective jurors raised their hands, and five of them served on the jury.[14] (ECF No. 35-2 at 67-84; ECF No. 36-2 at 3.) Juror #607 had a "gut reaction" to the state's overview of the case but stated, "It's not fair if I don't hear both sides, and there's always both sides, so." (ECF No. 35-2 at 69.) Juror #673 said, "You know, you have to see both sides and make sure everybody is—yeah." (*Id.*) Juror #709 stated that if she had "doubt pertaining," she would raise concerns if the State did not prove its case. (*Id.* at 78-79.) Juror #721 would not find Sprowson guilty just because she wanted to believe the victim if the State failed to prove its case. (*Id.* at 83.) Juror #740 could be fair to both sides. (*Id.* at 83-84.) Juror #756 felt the same way as Juror #607 but would base an opinion on the evidence and could deliver a not-guilty verdict if the State failed to prove its case. (*Id.* at 71-72.)

During jury selection, the prosecutor asked the venire whether they had ever heard the term "grooming," and prospective juror #651, who did not advance to the jury, responded that Clark County School District employees are required to watch sexual harassment videos discussing grooming, and alternate juror #754 had encountered numerous individuals who had experienced grooming:

_____

[14]Jurors #607, #646, #709, #740, and #756 served on the jury while #673, #721, and #724 did not serve.

1   [THE STATE]: [H]as anyone ever heard the term—I guess this term can be
2   used in many ways—but "grooming"?

    . . . .

3   PROSPECTIVE JUROR 651: All of us Clark County School District
4   employees are required to watch sexual harassment videos and in it it
    mentions being groomed or grooming, someone that targets an individual
5   and prepares them for some sort of sexual harassment.

6   . . . .

7   PROSPECTIVE JUROR 651: For example, a teacher might ask a student
    to stay after and maybe ask questions, leading questions, is your mom at
8   home, or something like that and try to get some information and, then,
    maybe compliment them, make them feel really good about who they are
9   and what they see, so that kind of thing.

10  [THE STATE]: [S]o and . . . another example of grooming . . . is that, then,
    the teacher starts meeting them every day.

11  PROSPECTIVE JUROR NO. 651: Exactly.

12  [THE STATE]: And, then, it's not at school anymore, it's away from school?

13  PROSPECTIVE JUROR NO. 651: Away from school, yes.

14  [THE STATE]: And, then, it's sleepovers and things like that?

    PROSPECTIVE JUROR NO. 651: Yes.
15
    [THE STATE]: That's grooming.
16
    PROSPECTIVE JUROR NO. 651: Yes.
17
    [THE STATE]: Has anyone ever been in that situation or around a child who
    was put in a situation of grooming?
18
    . . . .
19
    PROSPECTIVE JUROR NO. 754: My mom was a foster mom for 20 years,
20  lived in a house in California. We had about 21 kids in our house from ages
    17 to 3 months . . . So had about 67 different stories of that alone.

21  [THE STATE]: About children being groomed?

22  PROSPECTIVE JUROR NO. 754: Yes.

23  [THE STATE]: And, so, these children were—the reason why they were with
    you is because they had been sexually abused and taken from their
24  parents?

25  PROSPECTIVE JUROR NO. 754: Most, yes.

    [THE STATE]: Was it a situation where the child's own will is almost
26  overborne [sic] because of the grooming activity?

27  PROSPECTIVE JUROR NO. 754: Yes.

28  (*Id.* at 146-49.)

                                    48

1     During trial, the State elicited testimony from J.T.'s therapist, Vena Davis, that J.T.

2   was anxious about being cross-examined at trial:

3       Q: Okay . . . Did she express to you that there was still a court case going
        on.
4
        A: Yes.
5
        Q: And did she have fears or anxiety about that?
6
        A: Yes.
7       Q: Did she discuss with you a specific aspect of the case that made her
        particularly upset?
8
        A: Yes.
9
        Q: And what was that?
10
        A: Two things, people knowing that, you know, she was the victim and, then,
        also, being cross-examined.
11   (ECF No. 40-1 at 49-50.)

12     In closing argument, the State argued Sprowson groomed J.T:

13      [THE STATE]: Did the defendant's conduct constitute grooming? Now, we
        haven't heard really much about grooming in this case. Remember back in
14      voir dire, jury voir dire, that's when [the other prosecutor] talked to you all
        and asked you questions. There was a question asked in regards to
15      grooming, said, Does anyone know what grooming is, and everyone says,
        oh, yeah, I know what grooming is.
16
            And one of the school teachers actually gave us sort of a definition
17      of grooming, of sort of getting someone and complimenting them, isolating
        them, sort of pushing, pushing the envelope a bit was kind of the discussion
18      of it. Of course, when the defendant testified, he was asked do you know
        what grooming is. The defendant, who is a trained educator, as he's
19      described himself, who has been a school teacher for ten years, do you
        know what grooming is; no, I—I don't know what grooming is.
20
            Was there grooming here? The State would submit that the
21      defendant clearly performed the acts of leading away, taking away, enticing
        away, carrying away in this particular case. He did it physically by going
22      over and picking the child up from the residence and taking him [sic] to his
        house. He also did it sort of through acts over a longer period of time of
23      basically bringing the child closer to him, pushing the envelope, getting to
        more sort of contact situations, and that's how things went.
24

25
     (ECF No. 41-3 at 20-22.)
26
       Sprowson argued in closing that he did not know about grooming:
27
        Says that I'm grooming her. You know, I've heard the word "grooming." I
28      don't go into details. My area of expertise is academics. You know,

grooming would be something that a counselor might get into. You know, I kind of heard vaguely some terms about that. The question to me was, do I know exactly what it is. I—you know, I'm familiar with the term, but I don't know the details of what grooming involves and all this stuff. I don't get into that stuff. You know, maybe some teachers do. I didn't. I don't I'm sorry. Forgive me for not knowing.

(*Id.* at 69.)

The State argued in closing that J.T. demonstrated credibility in her reaction when Sprowson approached her with an exhibit during the trial:

[THE STATE]: And when she sat here, consider her demeanor . . . one thing that stuck out to me was that picture and the defendant's reactions yesterday as he sat in this seat, but nothing spoke louder when J.T. didn't realize that the defendant would get to approach her with exhibits and things like that. And she shot that chair back and started kind of to scream and to cry. Those types of things, those actions mean way more than anything that I could ever tell you in closing argument.

(*Id.* at 117.)

In closing argument, Sprowson argued he was willing to take responsibility for his part "in this." (*Id.* at 68, 92, 102.) In rebuttal, the State countered that Sprowson did not take responsibility about J.T., and, therefore, the jury must "tell him what he did was wrong":

[THE STATE]: [W]hen people won't take responsibility for their own actions, somebody else has to find them accountable for their actions.

. . . .

[H]e believes he has done nothing wrong, and that's what today is. That's what today's about, and that's about accountability. . . And when someone won't be responsible or hold themself [sic] accountable for their decisions, that's when a jury comes in.

You are the only 12 people who can tell him what he did was wrong. We ask that you go back there, you look at the evidence, you read the instructions and you listen to the testimony, and by that I mean look at your notes, and you find him guilty of those charges because he is guilty. . . .

(*Id.* at 121, 130.)

## 2.    Prosecutorial Misconduct

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Prosecutorial misconduct may "'so infec[t] the trial with

50

1    unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*,

2    483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

3    "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Van*

4    *Arsdall*, 475 U.S. at 681. "A criminal conviction is not to be lightly overturned on the basis

5    of a prosecutor's comments standing alone, for the statements or conduct must be viewed

6    in context; only by so doing can it be determined whether the prosecutor's conduct

7    affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). The

8    fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's

9    comments manipulated or misstated the evidence; (2) whether the trial court gave a

10   curative instruction; and (3) the weight of the evidence against the accused." *Darden v.*

11   *Wainwright*, 477 U.S. 168, 181-82 (1986).

12       A court reviews prosecutorial misconduct claims according to the "narrow"

13   standard of a due process violation, "not the broad exercise of supervisory power." *See*

14   *Darden*, 477 U.S. at 181. A petitioner cannot prevail on such a claim by merely showing

15   "that the prosecutors' remarks were undesirable or even universally condemned." *See id.*

16   To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient

17   significance to result in the denial of the defendant's right to a fair trial.'" *Greer*, 483 U.S.

18   at 765 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States*

19   *v. Agurs*, 427 U.S. 97, 108 (1976)). In making that determination, the Court looks to

20   various factors including the weight of the evidence, the prominence of the comment in

21   the context of the entire trial, whether the prosecution misstated the evidence, whether

22   the judge instructed the jury to disregard the comment, whether the comment was invited

23   by defense counsel in summation, and whether defense counsel had an adequate

24   opportunity to rebut the comment. *See Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir.

25   2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)).

26       Claims of prosecutorial misconduct require a reviewing court to first assess

27   whether the prosecutor's remarks were improper. *See United States v. Weatherspoon*,

28   410 F.3d 1142, 1146 (9th Cir. 2005) (first addressing whether a defendant made the

threshold showing the statements were improper). Once a statement is deemed improper, the next question is whether the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. This analysis is conducted considering the entire record. *See Greer*, 483 U.S. at 765-66; *see*, *e.g.*, *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005) (finding no improper closing under *Darden* where the prosecutor's argument was based upon a reasonable inference from the evidence); *see also Jones v. State*, 937 P.2d 55, 63 (Nev. 1997) (holding that a prosecutor may "argue inferences from the evidence and offer conclusions on contested issues").

"Prosecutorial misconduct which rises to the level of a due process violation may provide grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the 'harmless error' test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)." *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004). Under *Brecht*, "[p]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting 507 U.S. at 637).

### 3.    State Court's Determination

The NSC determined there was no prosecutorial misconduct except for the State's reference to "grooming," as no evidence supported the argument; however, in applying plain error review, that argument did not affect Sprowson's substantial rights:

*Prosecutorial misconduct*

[S]prowson argues that the State committed prosecutorial misconduct with statements made during voir dire and by improperly commenting on his constitutional rights. "When considering claims of prosecutorial misconduct, this court engages in a two-step analysis. First, we must determine whether the prosecutor's conduct was improper. Second, if the conduct was improper, we must determine whether the improper conduct warrants reversal." *Valdez*, 124 Nev. at 1188, 196 P.3d at 476 (footnotes omitted). Because Sprowson failed to object, reversal is warranted only if he demonstrates plain error that affected his substantial rights. *Id.* at 1190, 196 P.3d at 477.

Sprowson complains that the State's description of the case during voir dire was unduly inflammatory but we disagree. The language Sprowson complains about amounted merely to a factual recitation of the State's case. *See Gomez v. United States*, 490 U.S. 858, 874 (1989) (highlighting that

52

"voir dire represents jurors' first introduction to the substantive factual and legal issues in a case"). Sprowson next assigns error to the State identifying and keeping jurors who had a strong reaction to its introduction. But the record shows the State did not seek a commitment and the jurors who reacted also expressed their ability to be fair and impartial. *See Witter v. State*, 112 Nev. 908, 914, 921 P.2d 886, 891 (1996) ("The critical concern of jury voir dire is to discover whether a juror 'will consider and decide the facts impartially and conscientiously apply the law as charged by the court.'" (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980))), *abrogated on other grounds by Nunnery v. State*, 127 Nev. 749, 263 P.3d 235 (2011).

As to voir dire, Sprowson contends that "[t]he State indoctrinated the jury about grooming." The record does not support this claim. The State's colloquy with the jury on grooming sought to elicit information from the jurors, not to indoctrinate them. *See Khoury v. Seastrand*, 132 Nev. 520, 528-29, 377 P.3d 81, 87-88 (2016) (concluding that questions aimed at discovering the jurors' feelings on a specific issue are not indoctrination).

Next, Sprowson argues that the State committed prosecutorial misconduct by using a juror's definition of grooming to argue in closing that Sprowson groomed the victim. We agree that the State's reference to this grooming definition was improper because it was not based on evidence adduced at trial. *See Williams v. State*, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987) (reiterating that a prosecutor is not permitted to argue facts or inferences not supported by the evidence). But because Sprowson failed to object, plain-error review applies. The comment was brief and ample other evidence supports Sprowson's kidnapping conviction. *See Valdez*, 124 Nev. at 1190, 196 P.3d at 477. The error thus did not affect Sprowson's substantial rights as to require reversal based on plain-error review.

Lastly, Sprowson argues that the State erred in commenting on his constitutional rights. The record does not support Sprowson's contentions that (1) the State improperly inquired about the victim's fear of being cross-examined, (2) the State commented on Sprowson's right to confrontation when it highlighted the victim's reaction to Sprowson approaching her at trial, and (3) the State improperly urged the jury to hold Sprowson responsible. *See Domingues v. State*, 112 Nev. 683, 698-99, 917 P.2d 1364, 1375 (1996) (concluding there was no prosecutorial misconduct where the State reminded the jury that criminal defendants should be held accountable for their reprehensible acts).

(ECF No. 43-11 at 9-11.)

### 4.    Analysis of Ground 5

The NSC reasonably determined the State's introductory remarks did not affect Sprowson's substantial rights as they amounted to a factual recitation of the State's case against Sprowson, and, as demonstrated by the voir dire, the remarks did not unduly inflame the jurors because those who advanced to the jury stated they could be fair and

impartial and find acquittal if the State failed to prove its case. Sprowson claims the State's remarks unfairly characterized the allegations; however, Sprowson was able to clarify in his opening remarks that the allegations against him were contested. He claims the State's question as to whether the jurors had an emotional reaction to the overview of the case was an improper appeal to emotion; notwithstanding, the voir dire establishes the State's question aimed to determine whether jurors could set aside any emotions related to the topic of the case and consider the evidence without emotional bias. Sprowson claims that he was thwarted from contesting the State's characterizations in its introductory remarks, however, Sprowson was able in his opening remarks to explain he contested those characterizations.

The NSC reasonably determined the State's argument concerning grooming was improper as there was no evidence—beyond Sprowson's denial that he understood the concept—that supported the State's argument. Moreover, the NSC reasonably determined the State's argument, which concerned grooming in relation to the kidnapping charge, did not affect Sprowson's substantial rights because the weight of the evidence, much of it undisputed, supported inferences from which the jury could find Sprowson guilty of the kidnapping charge. *See Darden*, 477 U.S. at 182. It was undisputed that Sprowson agreed to and did take J.T. from her home and to his home in the middle of the night after instructing her to gather her social security card and birth certificate. He changed his phone number that night to avoid her mother's detection. He instructed J.T. not to use her telephone, go to school, or even go outside his townhome so that she would not be recognized. He instructed her to not have contact with her friends in-person or over the internet. When investigators and police asked him about J.T.'s whereabouts, Sprowson lied to them, claiming he had no contact with her. Thus, despite his protestation that he did not intend to keep J.T. from her mother, the evidence supported inferences from which the jury could find the intent required for the kidnapping charge. It is reasonable to conclude the improper argument about grooming did not affect Sprowson's substantial rights.

1    Finally, the NSC reasonably determined the record belies Sprowson's claim that

2    the State commented on his exercise of his constitutional rights. Nowhere in the record

3    did the State refer to Sprowson's exercise of his right to trial or failure to plead guilty.

4    Based on the record, it was reasonable to conclude the State properly inquired into J.T.'s

5    fear of cross-examination because a determination whether Sprowson's actions caused

6    her substantial mental harm was an element at issue for the child abuse charge. With

7    respect to the State's rebuttal argument that Sprowson must be held accountable for his

8    actions, Sprowson opened the door, by virtue of his argument about his willingness to

9    take responsibility for his actions. The State's argument urging the jury to consider J.T.'s

10   demeanor when Sprowson approached her during trial was an appropriate factor for the

11   jury to consider with respect to J.T.'s credibility and did not constitute vouching, as it did

12   not "convey the impression that evidence not presented to the jury, but known to the

13   prosecutor, supports the charges." *See United States v. Young*, 470 U.S. 1, 18-19 (1985)

14   (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)). With respect to the State's

15   remarks and argument, the trial court instructed the jury that counsel's statements were

16   not evidence (ECF No. 41-4 at 22), and jurors are presumed to follow instructions. *See*

17   *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

18   The NSC reasonably concluded that the allegations regarding the State's

19   conduct—whether considered individually or collectively—did not affect Sprowson's

20   substantial rights, as there is no basis to find that they rendered the trial so unfair as to

21   constitute a denial of due process. *See Donnelly*, 416 U.S. at 643. The Court denies

22   Ground 5 because the NSC's determinations are neither contrary to nor constitute an

23   unreasonable application of clearly established federal law as determined by the

24   Supreme Court and are not based on an unreasonable determination of fact.

25        **F.    Ground 6**

26   Sprowson alleges the effect of cumulative errors raised on direct appeal in

27   Grounds 1-5 prejudiced him and rendered his trial unfair. (ECF No. 21 at 19-20.)

28   Cumulative error applies where, "[A]lthough no single trial error examined in

1    isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple

2    errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381

3    (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining

4    a court must assess whether the aggregated errors "'so infected the trial with unfairness

5    as to make the resulting conviction a denial of due process'" (citing *Donnelly*, 416 U.S. at

6    643)).

7        The Nevada Court of Appeals determined the identified errors did not have a

8    cumulative impact on the kidnapping and child pornography convictions:

9        *Cumulative error*

10           Finally, Sprowson argues that we should reverse the judgment of
     conviction based on cumulative error. The evidentiary errors related to the
11    victim's mental health affected only the child abuse conviction, which we
     reverse. The quantity and character of the remaining errors we have
12    identified above are not significant. Nor do those errors appear to have had
     a cumulative impact on the jury's verdict that warrants reversal where the
13    issue of guilt was not close on the kidnapping and child pornography counts.
     *See Valdez*, 124 Nev. at 1195, 196 P.3d at 481 (when assessing cumulative
14    error claims, this court considers "(1) whether the issue of guilt is close, (2)
     the quantity and character of the error, and (3) the gravity of the crime
15    charged" (internal quotation marks omitted)).

16   (ECF No. 43-11 at 11-12.)

17        The NSC reasonably determined Sprowson failed to demonstrate prejudice based

18   on multiple errors (e.g., failure to elicit juror's excuses under oath in Sprowson's presence,

19   erroneous exclusion of mental health evidence for the child abuse conviction, and

20   prosecutor's erroneous argument about grooming) as the issue of guilt was not close for

21   the kidnapping and child pornography convictions. *See supra* at pp. 34-35, 53-54. Ground

22   6 is therefore denied.

23       **G.    Ground 7**

24        Sprowson alleges appellate counsel was ineffective in violation of the Fifth, Sixth,

25   and Fourteenth Amendments for failure to, based on the improper child abuse conviction

26   that the NSC reversed, challenge or request the kidnapping conviction be vacated on

27   remand to the trial court. (ECF No. 21 at 20-25.) He argues counsel was ineffective

28   because the State relied on the child abuse conviction to establish intent for kidnapping,

1    and the jury delivered a general verdict. (*Id.*) Respondents contend this claim has no

2    merit, and there is overwhelming evidence Sprowson kept J.T. confined away from her

3    mother as an alternate basis for establishing intent for kidnapping. (ECF No. 70 at 32-

4    34.)

5                    **1.    Ineffective Assistance of Counsel (IAC)**

6            "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it

7    promises only the right to effective assistance . . .." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).

8    An IAC claim requires a petitioner demonstrate (1) the attorney's "representation fell

9    below an objective standard of reasonableness[;]" and (2) the attorney's deficient

10   performance prejudiced the petitioner such that "there is a reasonable probability that, but

11   for counsel's unprofessional errors, the result of the proceeding would have been

12   different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "Unless a

13   [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from

14   a breakdown in the adversary process that renders the result unreliable." *Id.*

15          An IAC claim "must identify the acts or omissions of counsel that are alleged not

16   to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

17   A court considering an IAC claim "must indulge a strong presumption that counsel's

18   conduct falls within the wide range of reasonable professional assistance; that is, the

19   defendant must overcome the presumption that, under the circumstances, the challenged

20   action 'might be considered sound trial strategy.'" *Id.* at 689. Thus, a court is obliged to

21   "determine whether, in light of all the circumstances, the identified acts or omissions were

22   outside the wide range of professionally competent assistance." *Id.* at 690. "In making

23   that determination, the court should keep in mind that counsel's function, as elaborated

24   in prevailing professional norms, is to make the adversarial testing process work," and

25   "counsel is strongly presumed to have rendered adequate assistance and made all

26   significant decisions in the exercise of reasonable professional judgment." *Id.* "A fair

27   assessment of attorney performance requires that every effort be made to eliminate the

28   distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687-88. A petitioner bears the burden to overcome the presumption that counsel made sound trial-strategy decisions. *See Harrington*, 562 U.S. at 104. To establish a reasonable probability the result of the trial would have been different, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *see also Cullen*, 563 U.S. at 189.

To prevail on an ineffective assistance of appellate counsel claim, a petitioner "must show a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). In *Miller v. Keeney*, the Ninth Circuit Court of Appeals explained that, in applying *Strickland*'s two prongs to a claim of ineffective assistance of appellate counsel:

> "[T]hese two prongs partially overlap . . . In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue."

882 F.2d 1428, 1434 (9th Cir. 1989) (citations and footnotes omitted). Failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice for the same reason—the issue had little or no likelihood of success on appeal. *Id.*

///

### 2.    Additional Background

The State argued in closing that it established Sprowson had the requisite intent for kidnapping in three ways. First, Sprowson had the intent to keep J.T. from her mother permanently or for a protracted period. (ECF No. 41-3 at 26-39.) Second, Sprowson had the intent to perpetrate upon J.T. two unlawful acts: (1) child abuse with substantial bodily harm, and/or (2) contributing to the delinquency of a minor. (*Id.* at 38-48.) By general verdict, the jury convicted Sprowson on all charges. (ECF No. 41-6.)

On direct appeal, appellate counsel argued the exclusion of evidence about "why" J.T. sought mental health treatment and the details of J.T.'s relationship history, including her sexual history with other men, violated Sprowson's rights to confrontation and to present a defense to each offense. (ECF No. 43-1 at 4-5, 30-43.) Counsel argued J.T.'s history of meeting older men on the internet and running away from her family to be with them undermined the State's theory that Sprowson kidnapped J.T. by "enticing" her. (*Id.*)

### 3.    General Verdict, Invalid Theory, and Harmless Error

A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one. *See Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (first citing *Stromberg v. Cal.*, 283 U.S. 359 (1931); and then citing *Yates v. United States*, 354 U.S. 298 (1957)). *Stromberg* and *Yates* were decided before the Supreme Court concluded, in *Chapman v. California*, 386 U.S. 18 (1967), that constitutional errors can be harmless. *See id.* at 60. "[W]hile there are some errors to which [harmless-error analysis] does not apply, they are the exception and not the rule." *Id.* at 61 (quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)). "[S]o long as the error at issue does not categorically vitiat[e] *all* the jury's findings, the error may be deemed harmless." *Id.* (alteration in original) (citing *Neder v. United States*, 527 U.S. 1, 11 (1999) (quoting *Sullivan v. La.*, 508 U.S. 275, 281 (1993)); *see e.g.*, *Griffin v. United States*, 502 U.S. 46 (1991) (holding Due Process Clause does not require that, in federal prosecution, general guilty verdict in multiple-object conspiracy be set aside if evidence is inadequate to support conviction as to one object).

On direct review, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24; *see e.g.*, *United States v. Boulware*, 384 F.3d 794, 808-09 (9th Cir. 2004) (applying *Chapman* to erroneous evidentiary ruling that violated defendant's federal due process rights).

### 4.    State Court Determination

In state postconviction proceedings, the Nevada Court of Appeals ("NCA") determined appellate counsel's performance was neither deficient nor prejudicial because counsel challenged and urged reversal of the kidnapping conviction, and the NSC determined evidentiary errors related to J.T.'s mental health affected only the child abuse conviction:

> In his February 9, 2021, petition, Sprowson claimed that his appellate counsel was ineffective. To demonstrate ineffective assistance of appellate counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and prejudice resulted in that the omitted issue would have a reasonable probability of success on appeal. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1114 (1996). Both components of the inquiry must be shown. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Appellate counsel is not required to raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Rather, appellate counsel will be most effective when every conceivable issue is not raised on appeal. *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989). We give deference to the court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

> [S]prowson claimed his appellate counsel was ineffective for failing to challenge his first-degree kidnapping charge on direct appeal or in the trial court after his conviction was partially overturned. The Nevada Supreme Court reversed Sprowson's conviction for child abuse, neglect, or endangerment with substantial bodily harm and/or mental harm on direct appeal. *Sprowson v. State*, No. 73674, 2019 WL 2766854 (Nev. July 1, 2019) (Order Affirming in Part, Reversing in Part, and Remanding). Sprowson claimed his kidnapping conviction should have also been reversed because the State heavily relied upon the evidence that supported the child-abuse charge to prove that he committed kidnapping.

> Counsel challenged the kidnapping charge on direct appeal and urged the Nevada Supreme Court to reverse that conviction. Further, the Nevada Supreme Court concluded that "[t]he evidentiary errors related to

the victim's mental health affected only the child abuse conviction" and, therefore, reversal of Sprowson's remaining convictions was not warranted. *Id.* at *5. In light of counsel's challenge to the kidnapping charge and the Nevada Supreme Court's conclusions on direct appeal, Sprowson failed to demonstrate that his counsel's performance fell below an objective standard of reasonableness or a reasonable probability of a different outcome on direct appeal had counsel raised additional challenges to the kidnapping charge. Therefore, we conclude the district court did not err by denying this claim.

(ECF No. 16-12 at 2-3.)

### 5. Analysis of Ground 7

The NSC reasonably applied *Strickland* in concluding that appellate counsel was not ineffective. Counsel did not argue on appeal that, if the child abuse conviction were overturned, the kidnapping conviction must also be reversed, despite the fact that the State had presented child abuse as one of three alternative theories of intent supporting the kidnapping charge. An objectively reasonable attorney could foresee the futility of such a claim.

The State relied on the child abuse allegations to support only one of three theories of intent for kidnapping, and there was overwhelming evidence to support the theory that Sprowson's actions demonstrate his intent to keep J.T. from her mother. *See supra* at pp. 4-6, 53-54. There was also overwhelming evidence of intent based on Sprowson's actions in facilitating J.T.'s truancy from school, which supported the charge of contributing to the delinquency of a minor. *See supra* at pp. 4-6; (*see also* ECF No. 41-4 at 16.) Under the circumstances, an objectively reasonable appellate attorney could conclude that, even though there is a general verdict, the reversal of the child abuse conviction was harmless beyond a reasonable doubt insofar as it bore on the kidnapping conviction. *See Hedgpeth*, 555 U.S. at 58. Moreover, given the overwhelming evidence supporting the two alternate theories of intent for the kidnapping charge, the NSC reasonably concluded there is no reasonable probability the result of the appeal or remand would have been different but for counsel's failure to raise the claim.

Sprowson relies on *Leeds v. Russell*, 75 F.4th 1009 (9th Cir. 2023) to argue appellate counsel should have claimed the kidnapping conviction should be set aside

because "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." First, appellate counsel's decision cannot be measured against the authority in *Leeds* because *Leeds* postdates appellate counsel's representation. *See Strickland*, 466 U.S. at 689 (counsel's performance is evaluated based on "counsel's perspective at the time"). Second, *Leeds* is consistent with *Hedgpeth*'s ruling that harmless error would have applied had appellate counsel raised the claim on direct appeal. Third, *Leeds's* harmless error analysis is distinguishable from that in Sprowson's case. Leeds was charged with first-degree murder under only two theories: (1) felony-murder based on the theory that Leeds killed the victim during the perpetration of a burglary, and (2) willful, deliberate, and premeditated murder. *Leeds*, 75 F.4th at 1012. Trial counsel was ineffective for failure to argue Leeds could not be convicted of felony-murder with burglary as the underlying felony because Leeds lived at the residence where the killing occurred and could not, as a matter of law, burglarize his own residence. *Id.* at 1024-25. Because only two theories were available—one of which was inapplicable as a matter of law—and it was unclear which theory the jury relied upon in reaching its general verdict, there is a reasonable probability that the outcome would have been different but for counsel's error. In Sprowson's case, aside from the unlawful act of child abuse, overwhelming evidence supports the two alternate theories for establishing the requisite intent for kidnapping. Unlike in *Leeds*, there is no reasonable likelihood that appellate counsel could have succeeded on a claim that reversing the child abuse conviction required reversal of the kidnapping conviction on appeal.

Sprowson argues in a footnote in his reply brief that, after the NSC's decision in *Lofthouse v. State*, 467 P.3d 609 (Nev. 2020), neither child abuse nor contribution to the delinquency of a minor would constitute an "unlawful act" perpetrated upon a minor for purposes of establishing kidnapping. (ECF No. 21 at 24, n.4.) Sprowson did not raise this

1     argument in his state postconviction petition.[15]

2            When a prisoner "procedurally defaults" a federal claim, judicial review is barred

3     unless he can show either: (1) "cause for the default and actual prejudice as a result of

4     the alleged violation of federal law," or (2) "that failure to consider the claims will result in

5     a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

6     To demonstrate cause, a petitioner must show that some external factor impeded his

7     efforts to comply with the state's procedural rule. *See Maples v. Thomas*, 565 U.S. 266,

8     280-81 (2012). Ignorance or inadvertence does not constitute cause. *See Murray v.*

9     *Carrier*, 477 U.S. 478, 491-92 (1986). To show prejudice, a petitioner bears the burden

10    of showing not merely that the error created a possibility of prejudice but that the error

11    worked to his actual and substantial disadvantage, infecting the entire proceeding with

12    constitutional error. *See id.* at 494.

13           The NSC decided *Lofthouse* on July 16, 2020, and Sprowson filed his state

14    postconviction petition on February 9, 2021. Thus, the decision in *Lofthouse* predated

15    Sprowson's state postconviction petition in which he alleged ineffective assistance of

16    appellate counsel, and he provides no basis to conclude he was prevented from raising

17    the claim in his state petition. Thus, Sprowson does not establish cause to overcome the

18    default of this claim. Sprowson fails to show he was actually and substantially

19    disadvantaged or that failure to consider the claim will result in a fundamental miscarriage

20    of justice, as there is no reasonable probability the result of the appeal would have been

21    different but for appellate counsel's failure to raise a claim using the reasoning in

22    *Lofthouse*. At trial, the State relied heavily on the theory that Sprowson committed

23    kidnapping through actions demonstrating his intent to keep J.T. from her mother, and

24    abundant evidence supported that theory of intent.

25

26           [15]It appears the parties did not file the state petition of writ of habeas corpus. The
27    Court therefore takes judicial notice of the petition contained in the online docket records
      of the Nevada Court of Appeals and Nevada Supreme Court Case Nos. 83060 and
28    83060-COA. The petition and docket records of these courts may be accessed by the
      public online at Nevada Appellate Courts.

1    The Court denies Ground 7 because the NSC's determination that appellate

2   counsel's performance was neither deficient nor prejudicial is objectively reasonable

3   under the circumstances and is neither contrary to nor constitutes an unreasonable

4   application of *Strickland* and is not based on an unreasonable determination of fact.

5       **H.    Ground 8**

6       Sprowson alleges appellate counsel was ineffective for failing to raise a claim of

7   prosecutorial misconduct based on the State's knowing use of false or misleading

8   testimony in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 21 at 25-

9   30.) He claims J.T.'s medical and psychiatric records, submitted pretrial under seal but

10  not introduced at trial, establish J.T. and Smith gave false or misleading testimony. (*Id.*)

11  He claims the trial court's ruling excluding evidence regarding J.T.'s sexual abuse case

12  allowed the State to paint a misleading picture of J.T. as a normal girl with anxiety who

13  fought with her mother over mundane things and who was fundamentally altered by her

14  experience with Sprowson. (*Id.*) He contends that J.T.'s medical records contradict the

15  testimony about how many times she ran away from home, how long she was gone each

16  time, and the reason J.T. threatened suicide. (*Id.*) He contends the records show that J.T.

17  was not a normal teenager because she witnessed her father perpetrate domestic abuse

18  against her mother, and they lived in a homeless shelter. (*Id.*) Respondents contend the

19  testimony was neither false nor misleading and that any incompleteness resulted from

20  the trial court's exclusion of evidence. (ECF No. 70 at 34-37.) They further contend that

21  there is no reasonable probability appellate counsel would have succeeded on a

22  prosecutorial misconduct claim, as the NSC concluded that the trial court's error impacted

23  only the child abuse conviction. (*Id.*)

24  ///

25  ///

26  ///

27  ///

28

1

2

### 1.    Additional Background

#### a.    Medical and Mental Health Records[16]

According to a Child and Adolescent Functional Assessment (CAFAS), on March 21, 2012, when J.T. was 14 years old, she was severely impaired as a "run away from home overnight more than once, *or once for an extended time*, and whereabouts unknown to caregiver." (ECF No. 88-1 at 2) (emphasis added). The assessment states that, the month prior, J.T. "ran away from home on 2 separate occasions with older men" and was "running away with strangers." (*Id.* at 3.) The report suggests therapy to, among other things, "improve communication with her mother." (*Id.*)

On March 24, 2012, therapy notes state that, over the weekend, J.T. "reportedly met a 37-year-old man from New Mexico" who drove to Las Vegas. (ECF No. 88-3 at 2.) J.T. left her house, and the man took her to a hotel where they had sexual intercourse, and he returned her home. (*Id.*) J.T. told Smith about it the next day. (*Id.*) Smith reported the event to the police and told the therapist J.T. was "frequently dishonest." (*Id.*) J.T. expressed remorse for "leaving the house in the middle of the night." (*Id.*)

On October 28, 2012, J.T. reportedly "ran away from home" around 5:00 a.m. and returned on the evening of October 29, 2012. (ECF No. 88-9 at 2.) J.T. admitted she met a "stranger"—an approximately thirty-year-old man—on the internet, told him she wanted to run away from home, and asked him to pick her up. (*Id.*) She babysat his two-year-old child and slept on his couch but denied sexual involvement or activity. (*Id.*)

After police discovered J.T. at Sprowson's home on November 1, 2013, Monte Vista Hospital records state that J.T. was "threatening running away; states she wants to die." (ECF No. 88-10 at 2.) On November 16, 2013, Dr. Emmanuel NWapa, of Monte Vista Hospital, penned a letter stating J.T. "tried to kill herself" and "tried to jump off a

---

[16]Generally, the merits of claims raised in a federal habeas corpus petition are decided on the record that was before the state court when it adjudicated a claim. *See Cullen*, 563 U.S. at 180-81. It appears that J.T.'s medical and psychological records are included in the state court record because they were admitted as a state court exhibit, even though they were not introduced at trial. (ECF No. 36-3 at 14-16.)

balcony" because "she was having an argument with her mother in regards to a 19-year-old male boyfriend." (ECF No. 88-11 at 3.) Hospital records state J.T. denied attempting to hurt herself, and she threatened suicide so she could be with Sprowson. (*Id.* at 10, 13.)

According to a Willow Springs Center report dated December 18, 2013, J.T. "ran away from home for the first time age 14 for 1 week, then again for 2 weeks. Pt ran away age 16 for 2 months with a man she contacted through Craig's list." (ECF No. 88-13 at 2.) The report states that J.T. "threatened that she would kill herself if she had to live with mom" and "attempt age 16 via jumping off a stairwell after her mother set a boundary with her." (*Id.*) The report states J.T. "describes normal family arguments" and "admits to overreaction to mother's boundary setting." (*Id.* at 6.) The Willow Springs Center discharge summary states J.T. was admitted after "she reportedly tried to jump off the second-floor balcony after getting into an argument with her mother regarding men and boys." (ECF No. 88-14 at 2.) The report states J.T. "has a history of physical aggression toward her mother as well as destroying her room when angry." (*Id.* at 3.)

### b.    Trial Testimony

J.T. testified she ran away from home before running away with Sprowson. (ECF No. 37-1 at 124.) When asked how many times she ran away, J.T. replied, "I never ran away for a really long time, so like twice, and it was less than like two days, like less than a day, actually." (*Id.* at 124-25.)

J.T. testified that when she was 15 and 16 years old, she was having issues getting along with her mother and described the problems as "just like chores and like keeping my room clean and not staying out late. Like normal issues." (*Id.* at 101-02.) J.T. considered those to be "like huge problems" at the time. (*Id.*) J.T. testified that, after the police returned her to her mother, J.T. didn't hug her mother back and told her mother that she was mad at her, didn't want to be with her, and wanted to leave. (*Id.* at 59.) J.T. wrote a story in which she described her mother as an "evil stepmother." (*Id.* at 46.)

J.T. testified she and her mother had "an argument on the stairs" because her mother would not let her leave, so she was going to jump over the balcony to get out of

1   the house, but her mother stopped her. (*Id.* at 61-62.) J.T. agreed that she threatened to
2   kill herself if she couldn't be with Sprowson. (*Id.*) On cross examination, J.T. clarified that
3   she did not attempt to kill herself; rather, she merely threatened to do so. (*Id.* at 212.)

4       Smith described their relationship as "a teenage mom-and-daughter relationship"
5   with "good days" and "bad days," and "it's that push and pull where she thought she
6   shouldn't have rules and I'm the mom and have to give her rules." (ECF No. 38-1 at 34.)
7   She agreed with the State that it was a "typical mother-teenage relationship." (*Id.*) Smith
8   said they had "bumps" in the road in the past when they went to counseling "together,
9   and [J.T.] went individually for years, a couple of years." (*Id.* at 35.) When asked on cross-
10  examination whether she previously confiscated J.T.'s phone and computer, Smith
11  replied, "She's a teenager." (*Id.* at 83.) Smith testified that J.T. had run away from home
12  prior to leaving with Sprowson but denied that it had happened two or three times, stating
13  instead that it was only "for a day." (*Id.* at 49, 83.)

14      Smith testified that, after J.T. spent ten days at Monte Vista, she returned home,
15  and they had a "huge blow-up where [J.T.] was flipping out saying she was going to kill
16  herself if she couldn't be with him. She tried to jump off my upstairs balcony," and "she
17  tried to jump over that, saying she was going to kill herself, she didn't want to live." (*Id.* at
18  72-73.) Dr. Bryn Rodriguez testified that, when J.T. returned to Monte Vista after
19  attempting to jump over a banister in her home, "there was less Melvyn, and it was much
20  more about just being generally upset with everything going on." (*Id.* at 69.)

21          **2.   Prosecutorial Misconduct under *Napue***

22      A conviction obtained using false evidence violates a defendant's due process
23  rights. *See Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). This is true whether
24  the prosecutor knew the evidence was false or should have known it was false. *See*
25  *Agurs*, 427 U.S. at 103. To prevail on a false evidence claim, the petitioner must satisfy
26  three elements: (1) the testimony or evidence in question was false or misleading; (2) the
27  prosecution knew or should have known that the testimony or evidence was false or
28  misleading; and (3) that the false testimony or evidence was material. *See Panah v.*

67

1    *Chappell*, 935 F.3d 657, 664 (9th Cir. 2019). Evidence is not material if "the false

2    testimony could not in any reasonable likelihood have affected the judgment of the jury."

3    *Napue*, 360 U.S. at 271. A false evidence claim fails if, absent the false testimony or

4    evidence, the petitioner still "received a fair trial, understood as a trial resulting in a verdict

5    worthy of confidence." *Panah*, 935 F.3d at 664.

6         "[T]he presented testimony must have actually been false," and "[t]estimony that is

7    simply inconsistent or equivocal may not rise to the requisite level of actual falsity." *Catlin*

8    *v. Broomfield*, 124 F.4th 702, 741 (9th Cir. 2024) (citing *Hayes v. Ayers*, 632 F.3d 500,

9    520-21 (9th Cir. 2011)); *see also United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th

10   Cir. 1995) (overruled on other grounds by *Valerio v. Crawford*, 306 F.3d 742, 764 (9th Cir.

11   2002)). "Discrepancies in the testimony about the details . . . could as easily flow from

12   errors in recollection as from lies." *Zuno-Arce*, 44 F.3d at 1423.

13        "The government's duty to correct perjury by its witnesses is not discharged merely

14   because defense counsel knows, and the jury may figure out, that the testimony is false.

15   Where the prosecutor knows that his witness has lied, he has a constitutional duty to

16   correct the false impression of the facts." *United States v. LaPage*, 231 F.3d 488, 492

17   (9th Cir. 2000). "This obligation obtained even though the government did not solicit the

18   false testimony and the false testimony went only to the credibility of the witness, not to

19   substantive evidence." *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003) (citing

20   *Napue*, 360 U.S. at 269-70).

21                        **3.    State Court's Determination**

22        On state postconviction review, the NCA determined, considering the trial court's

23   evidentiary ruling, Sprowson did not demonstrate appellate counsel was ineffective

24   because he failed to show the State committed misconduct:

25                [S]prowson claimed his appellate counsel was ineffective for failing
            to argue that the State committed prosecutorial misconduct by presenting
26          false or misleading testimony during trial. Sprowson asserted in his petition
            that the victim previously engaged in relationships with older men, she
27          sought to conceal that activity from her mother, and she ran away from
            home to be with other men on multiple occasions. Sprowson asserted that
28          the State improperly permitted witnesses to refrain from explaining those

                                              68

issues to the jury and that doing so allowed the State to improperly assert he committed kidnapping by enticing the victim into staying away from her mother.

The trial court issued an order precluding the parties from referencing the victim's prior relationships with other men and her mental health issues stemming from those relationships. In light of the trial court's order concerning that information, Sprowson did not demonstrate that the State committed misconduct by refraining from questioning witnesses concerning those issues. Because Sprowson did not demonstrate improper conduct by the State, he did not demonstrate his counsel's performance fell below an objective standard of reasonableness by failing to argue that the State committed misconduct or a reasonable probability of a different outcome on direct appeal had counsel raised the argument. *See Valdez v. State*, 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008) (providing appellate courts first review claims of prosecutorial misconduct for improper conduct and then determine whether reversal is warranted). Therefore, we conclude the district court did not err by denying this claim.

(ECF No. 16-12 at 4.)

### 4.    Analysis of Ground 8

Sprowson has not established the State presented false or misleading testimony. He has not established any basis to conclude J.T.'s medical and psychiatric records, which constitute hearsay, state the truth about the number of times and length of time J.T. ran away from home[17] or the reason why she threatened suicide.[18] The trial testimony was not misleading as to whether J.T. was a normal teenager. The jury was informed

---

[17]The medical and psychiatric records do not contradict J.T.'s testimony that she ran away from home twice. The March 2012 Assessment indicates J.T. may have run away only once. Therapy notes from March 2012 do not necessarily confirm J.T. ran away from home, as she was gone only part of the night. In October 2012, J.T. told her mother she was running away from home, but J.T. did not take her belongings and returned the following evening. Thus, J.T.'s records do not necessarily contradict J.T.'s testimony that she twice ran away from home. Some of the records contradict J.T.'s testimony about the length of time she was gone when she ran away; however, Sprowson has not established which portions of the records are true or that J.T.'s testimony is false.

[18]Although Dr. Emmanuel NWapa stated in a letter that J.T. "tried to kill herself" and "tried to jump off a balcony" because "she was having an argument with her mother in regards to a 19-year-old male boyfriend," other hospital records state J.T. "threatened that she would kill herself if she had to live with mom" and "after her mother set a boundary with her." (ECF No. 88-11 at 3, 10, 13.) Sprowson fails to establish Dr. NWapa's assertions in his letter as true and therefore has not established the testimony of J.T. and her mother as false.

that, before J.T. met Sprowson, J.T. and her mother had conflict, J.T. twice ran away from home, J.T. did not wish to obey her mother's rules, her mother took away her phone and computer, J.T. and her mother underwent therapy together, and J.T. underwent individual therapy for two years for heightened anxiety, overwhelming emotions, history of abandonment, her father's leaving the family when she was five or six years old, and her never having a consistent father-daughter relationship in wake of his absence. The jury was informed that, after meeting Sprowson, J.T. characterized her mother as an "evil stepmother," did not want to live with her mother, was angry with her mother, did not want to hug her mother, and wanted to leave her mother's home to return to Sprowson. Although J.T.'s experiences witnessing domestic violence and living in a homeless shelter may have been relevant to the child abuse conviction, it was irrelevant to establishing any fact of consequence for the kidnapping and child pornography convictions.

As the NSC reasonably stated, information conveyed in the medical records was omitted from the testimony because the trial court's ruling excluded such evidence. The State cannot be faulted for failing to present evidence that was excluded by the trial court where there is no basis to conclude the evidence presented was false or misleading. The NSC was reasonable in its determination that, considering the trial court's ruling, Sprowson did not demonstrate the State committed misconduct by refraining from questioning witnesses concerning those issues. The NSC reasonably concluded Sprowson did not show appellate counsel's performance fell below an objective standard of reasonableness or a reasonable probability of a different outcome on appeal.

The Court denies Ground 8 because the NCA's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact.

## I.    Ground 9

Sprowson alleges appellate counsel provided ineffective assistance in violation of the First, Fifth, Sixth, and Fourteenth Amendments by failing to challenge the

70

1    constitutionality of the child pornography convictions on the grounds that the terms

2    "encourage," "entice," and "permit," under NRS § 200.710, are unconstitutionally

3    overbroad and vague. (ECF No. 21 at 30-32.) Sprowson argues his actions did not fall

4    within the intended meaning of the statute because he was not physically present when

5    J.T. took the photos, J.T. had ultimate control over the production of the photos, and

6    several minutes passed between his requests for the photos until J.T. sent them to him.

7    (*Id.*) Respondents argue that counsel was not ineffective because the terms are not vague

8    or overbroad, child pornography is unprotected under the First Amendment, and the NSC

9    already upheld the statute as constitutional on other grounds. (ECF No. 70 at 37-40.) In

10   reply, Sprowson counters that Black's Law Dictionary defines "to use," "to permit," and "to

11   encourage" as implicating a person has dominion or control over another's actions or that

12   their actions play a vital role in a criminal outcome. (ECF No. 94 at 71.)

13        The NCA rejected this claim:

14        [S]prowson claimed his appellate counsel was ineffective for failing
          to argue that the crime of use of a child in the production of pornography
15        was unconstitutional because the terms encourage, entice, and permit as
          used in the relevant statute are vague and overbroad. Pursuant to NRS
16        200.710(1), "[a] person who knowingly uses, encourages, entices or permits
          a minor to simulate or engage in or assist others to simulate or engage in
17        sexual conduct to produce a performance is guilty" of unlawful use of a
          minor in producing pornography or as subject of sexual portrayal in
18        performance.

19        A statute is presumed to be constitutional, and the party challenging
20        its constitutionality "has the burden of making a clear showing of invalidity."
          *State v. Castaneda*, 126 Nev. 478, 481, 245 P.3d 550, 552 (2010) (internal
21        quotation marks omitted). A statute is void for vagueness "(1) if it fails to
          provide a person of ordinary intelligence fair notice of what is prohibited; or
22        (2) if it is so standardless that it authorizes or encourages seriously
          discriminatory enforcement." *Id.* at 481-82, 245 P.3d at 553 (internal
23        quotation marks omitted). Sprowson did not demonstrate that the terms
          "encourage," "entice," and "permit" as utilized in NRS 200.710(1) fail to
24        provide a person of ordinary intelligence fair notice of what is prohibited or
          that those terms are so standardless that the statute authorizes or
25        encourages seriously discriminatory enforcement. In addition, the Nevada
          Supreme Court has already concluded that statutes barring the sexual
26        portrayal of minors, such as NRS 200.710, are not overbroad. *Shue v.
27        State*, 133 Nev. 798, 805, 407 P.3d 332, 338 (2017). Thus, Sprowson failed
          to meet his burden of making a clear showing that NRS 200.710 is invalid.

28

71

1

2

3

> Accordingly, Sprowson failed to demonstrate that his counsel's performance fell below an objective standard of reasonableness by failing to raise the underlying claim or a reasonable probability of a different outcome on direct appeal had counsel done so.

(ECF No. 16-12 at 5-6.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

The NSC reasonably concluded Sprowson fails to establish a person of ordinary intelligence could not understand the terms "encourage," "entice," and "permit" or that those terms fail to give fair notice of the actions prohibited by the act or are so standardless that they authorize or encourage seriously discriminatory enforcement. Contrary to Sprowson's claims, the statute is not vague and overbroad as applied to these circumstances. Sprowson provides no basis to conclude the legislature intended a defendant's personal presence or concurrent communication with a minor while encouraging, enticing, or permitting the production of a "sexual portrayal" or requiring a defendant be in a position of authority over the child. Sprowson's claim that the NSC's determination is objectively unreasonable because it did not remand for an evidentiary hearing on the claim is without merit as the claim fails based on a legal argument, and appellate counsel cannot be found ineffective for failure to raise a claim that, as a matter of law, lacks merit. *See, e.g.*, *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("Appellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal."). Accordingly, it was reasonable for the NSC to refrain from remanding for an evidentiary hearing.

20

21

22

23

The Court denies Ground 9 is denied because NSC's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on an unreasonable determination of fact.

24

## V.     CERTIFICATE OF APPEALABILITY

25

26

27

28

This is a final order adverse to Petitioner. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a Certificate of Appealability. The Court has *sua sponte* evaluated the claims in the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *see also Turner v. Calderon*, 281 F.3d 851, 864-65 (9th

1  Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner "has

2  made a substantial showing of the denial of a constitutional right." For claims rejected on

3  the merits, a petitioner "must demonstrate that reasonable jurists would find the district

4  court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*,

5  529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For

6  procedural rulings, a COA will issue only if reasonable jurists could debate whether (1)

7  the petition states a valid claim of the denial of a constitutional right; and (2) the procedural

8  ruling was correct. *Id.* Applying these standards, a COA is warranted on Grounds 1, 2, 4,

9  5(B), 6, and 7.

10 **VI.    CONCLUSION**[19]

11         It is therefore ordered that Petitioner's Second-Amended Petition (ECF No. 21) is

12 denied.

13         It is further ordered that all requests for an evidentiary hearing are denied.

14         It is further ordered that a Certificate of Appealability is granted for Grounds 1, 2,

15 4, 5(B), 6, and 7.

16         It is further ordered that the Clerk of Court is directed to (1) substitute Nathanjah

17 Breitenbach for respondent Warden Baker; and (2) enter judgment accordingly and close

18 this case.

19         DATED THIS 11th Day of September 2025.

21         _____

22         MIRANDA M. DU
           UNITED STATES DISTRICT JUDGE

27 [19]The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

73